**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thurnell ALSTON, Ervin Brennon,
Defendants–Appellants.**

No. 88–8802.

United States Court of Appeals,
Eleventh Circuit.

March 8, 1990.

Donald F. Samuel, The Garland Firm, P.C., Atlanta, Ga., for Thurnell Alston.

Richard D. Phillips, Ludowici, Ga., for Ervin Brennon.

Hinton R. Pierce, U.S. Atty., William H. McAbee, II, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

## I. INTRODUCTION

### A. *Procedural History and Issues Presented.*

In this case, appellant Thurnell Alston was convicted after a jury trial of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; use of a telephone to facilitate the distribution of cocaine, in violation of 21 U.S.C. § 843; and accepting a bribe as a public officer under the Hobbs Act, in violation of 18 U.S.C. § 1951. The jury found Alston not guilty of possessing a small amount of cocaine with intent to distribute it on two separate dates.

Appellant Ervin Brennon was charged with the same cocaine-related offenses as Alston but reached a plea agreement with the government, pursuant to which Brennon entered a guilty plea on a single count of possession with intent to distribute several ounces of cocaine.

Appellant Alston claims that the district court erred by (1) failing to find that the prosecutor intentionally excluded black persons from the jury; (2) refusing to instruct the jury on entrapment; (3) failing to find that Alston was a minor or minimal participant in the cocaine scheme under the United States Sentencing Guidelines; and (4) finding that the cocaine conspiracy involved three kilograms of cocaine instead of either six ounces or, at most, one kilogram. These allegations of error focus on factual determinations by the district court and are subject to the clearly erroneous standard. After a careful review of the record, we find no error.

Appellant Brennon raises only two issues that warrant discussion. He claims that the district court incorrectly determined his base offense level for the single charge to which he pled guilty when it considered his involvement with a quantity of cocaine not covered by the count of conviction. Brennon also claims that even if the sentencing court could take into account his involvement with a quantity of drugs not covered by the count of conviction, that court cannot consider such conduct unless it is proven beyond a reasonable doubt. These claims are without merit. A straightforward reading of the Sentencing Guidelines reveals that a sentencing judge can and should consider the defendant's involvement with a quantity of drugs not covered by the count(s) of conviction when such conduct was undertaken in the "same course of conduct or common scheme or plan as the offense of conviction." United States Sentencing Guidelines § 1B1.3(a)(2).[1] Second, as was the case before enactment of the Sentencing Guidelines, sentencing judges are free to consider such conduct when proven by a preponderance of the evidence.

### B. *The Facts.*

Georgia Bureau of Investigation Agent Billy Carter met Alston for the first time on November 3, 1987, after the two were introduced by a government informant. Agent Carter[2] projected the image of a

---

1. As explained in footnote 8 *infra*, the application notes accompanying § 1B1.3 were amended effective November 1, 1989.

2. Agent Carter of course assumed an alias while working undercover in this case. We will nevertheless refer to him as "Carter" or "Agent Carter" throughout this opinion.

drug dealer who was interested in opening a nightclub and/or teen center in McIntosh County, Georgia, where appellant Alston served as a county commissioner. At their initial meeting, Agent Carter solicited Alston's assistance in securing a liquor license and the necessary approval for his proposed "club." A tape of the conversation revealed that Alston agreed to accept $1200 every two weeks from Agent Carter for his help in securing approval for the proposed "club." After Carter indicated that he desired to use the "club" as a location from which to sell cocaine, Alston suggested that he could keep Carter informed about law enforcement investigations into the drug trade in McIntosh County.

Two days later, on November 5, 1987, County Commissioner Alston attended a meeting previously arranged by the Chairman of the McIntosh County Commission to address the drug problem in McIntosh County. This meeting was arranged as a private discussion between McIntosh County Investigator Jimmy Amerson and an agent of the Federal Drug Enforcement Administration. Alston had not been authorized to attend the meeting, but was informed by Investigator Amerson that federal authorities were contemplating an investigation into drug activity in McIntosh County. Alston brought with him Appellant Brennon, his brother-in-law, whom Alston presented as someone who could be an informer in a federal drug investigation and would be in a position to provide vital information for planning and organizing such an investigation.

Immediately after his November 5, 1987, meeting with the DEA agent in connection with the proposed federal investigation, Alston attended a pre-arranged meeting with Carter. At their meeting, Alston again told Carter that he could advise Carter of law enforcement operations in the county through his own inside knowledge of those activities and through investigator Amerson, who Alston claimed would keep him

informed. At this second meeting, Alston received the first of eight, $1200 payments.

For the next six months, Alston made various arrangements to assist Agent Carter in gaining approval for his "club." In December of 1987, Alston introduced Agent Carter to Ervin Brennon, a person Alston claimed was trustworthy and could "do business" with Carter. In the early spring of 1988, Agent Carter met with Alston on several occasions to further the arrangements for opening the "club" and to make additional payments to Alston.

Carter also met with both Alston and Brennon at Alston's home on several occasions to discuss plans for a partnership between Carter and Brennon to control the cocaine trade in McIntosh County. While Alston did not actively participate in the discussions, he (1) was present during these meetings at his home, (2) agreed to keep Brennon and Carter apprised of drug-related investigations in the county, (3) passed messages from Carter to Brennon regarding their cocaine transactions, and (4) made sure that Carter and Brennon were not disturbed while making their plans or transacting the sale of six sample ounces of cocaine.

Alston, Brennon, and Carter understood that the relatively small quantity of cocaine sold to Carter was a preclude to a much larger transaction. On various occasions, Brennon and Carter discussed a multi-kilogram cocaine transaction in Alston's presence. Although it was his practice to contact Alston before travelling to McIntosh County, in the latter part of April, 1988, a week after Carter, Brennon and Alston had discussed the per-kilogram price at which Brennon could deliver large quantities of cocaine, Carter paid an unannounced visit to Alston and Brennon. Carter picked up Alston and Brennon and drove them to a nearby hotel, where he displayed $100,000 in cash as evidence that he had the resources to purchase several kilograms of cocaine.[3] The original plan was for Brennon to sell Carter three to five kilograms of

---

**3.** Carter did not contact Alston and have Alston in turn contact Brennon to arrange a meeting, which was the usual practice between the par-

ties, because Carter did not want to jeopardize his own safety by informing Alston and Brennon that he would be carrying $100,000 in cash.

cocaine depending upon the quantity that would be available from Brennon's local supplier.

Later that same day, the three men returned to Alston's home, where Brennon and Carter discussed the specifics of the sale in Alston's presence. When pressed, Brennon stated that while his local supplier had three kilograms of cocaine in his possession at the time, the supplier was only willing to give Brennon one of them. At that point, Alston proposed that he and Brennon should make arrangements to get more kilograms of cocaine from their contacts in Florida. Alston suggested that Brennon should carry the money to Florida and get them himself. The record indicates that the meeting ended with Brennon agreeing to check into getting additional kilograms of cocaine as Alston had suggested and to deliver either a one or three kilogram quantity to Carter within approximately a week.

On April 28, 1988, the investigation was terminated and both appellants were arrested because Agent Carter's true identity was leaked by a grand juror from McIntosh County who told a relative of Brennon's that Carter was really a GBI agent.

## II. DISCUSSION

A. *Appellant Alston's Batson Challenge.*

██ Four of the government's six mandatory peremptory challenges were exercised against black members of the venire panel. The jury was comprised of eleven white persons and one black. Appellant Alston challenged the government's use of its peremptories in this fashion and the court held a hearing outside of the jury's presence. The court noted that there was a *prima facie* case of intentional discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), based exclusively upon the fact that the prosecutor had struck four black jurors and that the defendant was black. To establish a *prima facie* case of intentional discrimination in the exercise of perempto-

ry challenges, the defendant must "raise an inference" that the prosecutor used peremptories to exclude a member of a recognized minority from the petit jury because of his or her race.[4]

██ Once a *prima facie* case is demonstrated under *Batson*, the prosecutor must go beyond merely denying that he had a discriminatory motive and must provide "a neutral explanation related to the particular case to be tried." *Id.* at 98, 106 S.Ct. at 1724 (footnote omitted). The prosecutor's explanation must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the peremptory challenges in the contested manner. *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20. "As stated by the *Batson* court, 'the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.'" *United States v. David*, 844 F.2d 767, 69 (11th Cir.1988), quoting *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

> "[A] finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. [Citation omitted.] Since the trial judge's finding in the context under consideration here [*i.e.*, in determining whether the prosecutor purposefully discriminated in exercising peremptories] largely will turn on an evaluation of credibility, a reviewing court ordinarily should give those findings great deference. [Citation omitted.]

*Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Thus, a district court's finding regarding whether the prosecutor engaged in purposeful discrimination is subject to the clearly erroneous standard. *See David*, 844 F.2d at 769.

██ In this case, the district court held a full evidentiary hearing to determine whether the federal prosecutor removed four of the five black veniremen on the basis of their race. After a careful review of the record, we conclude that the district court was not clearly erroneous in finding

---

**4.** The government does not challenge the *prima facie* case holding by the district court in this appeal. Therefore, we do not consider whether

the circumstances in this case support a *prima facie* case of discrimination.

that the government rebutted the *prima facie* case of purposeful discrimination. The prosecutor provided specific explanations for striking the black venirepersons in question on the basis of friendship or acquaintance with the defendant; difficulty in hearing, which would make understanding the tape-recorded evidence to be used in the trial difficult; prior family involvement with drug charges; and a reputation with the local law enforcement community for involvement in the drug trade. Far from a mere "hunch" or poorly articulated motive, the prosecutor provided "reasonably specific" and "neutral" explanations.[5]

### B. The Failure to Charge the Jury on Entrapment.

Appellant Alston claims that the district court erred in refusing to charge the jury on the defense of entrapment. We disagree.

■ A valid entrapment defense rests upon two interrelated elements: the defendant's lack of predisposition to commit the crime charged, and government inducement of the defendant to engage in criminal conduct. *Matthews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

■ Before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid entrapment defense must be present. In essence, this means that the trial court must determine whether a juror could entertain a reasonable doubt about whether the defendant was entrapped. *See United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir.1985); *United States v. Wolffs*, 594 F.2d 77 (5th Cir.1979). This court, and its predecessor the Fifth Circuit, have articulated the standard as "some evidence must be shown, but more than a scintilla must be presented." *United States v. Lee*, 694 F.2d 649, 653 (11th Cir.1983), *citing United States v. Reyes*, 645 F.2d 285 (5th Cir.1981). In giving concrete meaning to this standard, this court stated in *United States v. Andrews*, 765 F.2d at 1499.

A defendant who seeks to raise a defense of entrapment must first come forward with evidence sufficient to raise a jury issue "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975). A defendant will be considered to have met this burden if he produces "any evidence" that governmental conduct created such a risk, *Pierce v. United States*, 414 F.2d 163 (5th Cir.), *cert. denied*, 396 U.S. 960, 90

---

5. The thrust of appellant's argument that the district court's finding was erroneous is that the district court failed to consider whether the reasons offered by the government for excluding a black member of the venire also applied to white members. *See United States v. Wilson*, 853 F.2d 606, 610 (8th Cir.1988) ("What constitutes a neutral explanation is a question of comparability."); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir.1987) (To determine pretext, court must consider whether reasons given to strike black jurors also applied to prospective white jurors).

It is of course true that comparing the attributes of the black and white venirepersons will aid the trier of fact and a reviewing court in determining whether the asserted reasons are pretextual or not. The attributes relied upon by the prosecutor in striking potential jurors are not always easily compared, however, and often require an evaluation of the degree to which the prospective juror manifests the stated attribute.

In this case, for example, appellant asserts that "old jurors were excused if they were black, but not if they were white. Jurors with a drug problem [in their family] were excused if they were black, but not if they were white. Jurors who misunderstood a voir dire question were struck if they were black but not if they were white." Appellant's brief at 18. The trial judge is in a superior position to determine whether white members of the venire who were not struck had a greater, lesser, or the same degree of difficulty in following voir dire questions, or whether a prospective white juror's familiarity with a family drug problem was as significant as that of an excluded black member of the venire. We are persuaded by a close reading of the *Batson* hearing transcript that the trial judge was not clearly erroneous in his evaluation that the prosecutor's reasons for excluding the black jurors did not apply equally to white jurors, and therefore that the stated reasons were not pretextual.

S.Ct. 435, 24 L.Ed.2d 425 (1969), but evidence that the government agent sought out or initiated conduct with the defendant, or was the first to propose the illicit transaction, has been held to be insufficient to meet the defendant's burden. *United States v. Humphrey,* 670 F.2d 153 (11th Cir.1982); *United States v. Hill,* 626 F.2d 1301 (5th Cir.1980). The defendant must demonstrate not merely inducement or suggestion on the part of the government, but an "element of persuasion or mild coercion." *United States v. Hill, supra.* The defendant may make such a showing by demonstrating that he had not favorably received the government plan, and the government had to "push it" on him, *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979), or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate, *United States v. Timberlake,* 559 F.2d 1375 (5th Cir.1977). When the defendant makes such a showing, the burden shifts to the government to demonstrate beyond a reasonable doubt that the defendant was predisposed to commit the offense charged. *United States v. Dickens, supra.* In demonstrating predisposition, the government is not restricted to using past offenses or reputation evidence. *Id.* at 445. Evidence of predisposition may also include the readiness or eagerness of the defendant to deal in the proposed transaction, *id.; United States v. Jones,* 473 F.2d 293 (5th Cir.1973), or post-crime statements such as "if you need more, I'll be here," *United States v. Dickens, supra; United States v. Jenkins,* 480 F.2d 1198 (5th Cir.1973).

■ The determination of whether a sufficient evidentiary foundation exists in the record which could support a jury's acceptance of an entrapment defense "is properly a question for the trial judge, the standard of review being abuse of discretion." *United States v. Mayo,* 705 F.2d 62, 68 (2d Cir.1983), quoting *United States v. Fleishman,* 684 F.2d 1329, 1342 (9th Cir.1982).[6]

1. Entrapment and the Hobbs Act charges.

■ With regard to the Hobbs Act charges, we are satisfied from our review of the record that Mr. Alston failed to come forward with "more than a scintilla" of evidence that the Government's conduct created a risk that the offense was committed by a person other than one ready to commit it. Mr. Alston agreed to accept money (1) in exchange for his influence with the McIntosh County Commission in securing approval for Agent Carter's proposed "club," and (2) suggested, without request by Agent Carter, that he could keep Carter informed of local and federal law enforcement operations in McIntosh County so that Carter could transact drug deals at the club without fear of detection and/or prosecution. As was stated in *Andrews,* "Evidence of predisposition may also include the readiness or eagerness of the defendant to deal in the proposed transaction [citation omitted] ... or post-crime statements ..." *Andrews,* 765 F.2d at 1499. Likewise, with regard to inducement, we agree with the district court's statement that "the level of deceitfulness in this case is almost rather mild." The tape-recorded conversation between Alston and Carter at their initial meeting revealed that Carter did not refuse or discourage Carter, but instead took an active role in setting the price at which his "help" could be purchased.

2. Entrapment and the cocaine-related charges.

■ Nor do we find any merit to appellant's argument that the district court erred in not charging the jury on entrap-

**6.** In *Mayo,* the court observed that in making the determination of whether there exists a sufficient factual predicate for a defense of entrapment, the trial court must examine the record of the case in the light most favorable to the defendant, "and with the understanding that resolution of 'an issue of credibility as between the agent and the defendant ... is peculiarly within the jury's province.'" *Mayo,* 705 F.2d at 68, quoting *United States v. Riley,* 363 F.2d 955, 958 (2d Cir.1966). In this case, there was no "issue of credibility as between the agent and the defendant" since the conversations between the agent and the defendant were tape-recorded.

ment with regard to the cocaine offenses. The decision to introduce Agent Carter to Brennon for the purpose of their "doing business" together was Alston's. Appellant Alston conveyed messages concerning proposed cocaine transactions, arranged for meetings between Carter and Brennon at his (Alston's) home to discuss cocaine transactions, and advised Brennon on how they might bypass Brennon's regular cocaine supplier and obtain kilogram quantities of cocaine from Florida themselves. Alston never once expressed even a distaste for the cocaine-related activity; he only sought to confine his involvement to that of a "lookout" and facilitator. The record also reflects that Carter did not pressure Alston into engaging in cocaine-related activities in order to continue receiving the bi-weekly payments for helping Carter to gain county approval for the "club."

C. *Sentencing Guideline Issues.*

1. "Minor or minimal participant" status.

 Appellant Alston claims that the district court erred in not decreasing the base level of his offense under United States Sentencing Guidelines § 3B1.2 since he was a "minor or minimal participant" in the drug conspiracy. This argument is without merit.

As the Fifth Circuit recently held in *United States v. Mejia–Orosco,* 867 F.2d 216 (5th Cir.1989), section 3742(d) of Title 18, renumbered as 18 U.S.C. § 3742(e) by the Anti–Drug Abuse Act of 1988, Pub.L. 100–690, requires a court of appeals to "accept the findings of fact of the district court [in applying the Sentencing Guidelines] unless they are clearly erroneous." The requirement in Guidelines § 3B1.2 that a judge determine whether the defendant was a "minor" or "minimal" participant is

a factual determination and therefore subject to the clearly erroneous standard. *Id.* at 221.[7] It follows from what we have already stated with regard to Appellant Alston's involvement with the cocaine conspiracy that there was ample record evidence to support the district court's finding that Alston was not a "minor" or "minimal" participant in the scheme.

2. The quantity of drugs relevant in sentencing.

 Appellant Alston also complains that the district court erred in determining a base offense level under the Guidelines which reflected a cocaine conspiracy involving three kilograms of cocaine. Alston asserts that the quantity of drugs involved in the conspiracy was six ounces, the amount actually sold to Carter by Brennon; and that neither Brennon nor Alston had any capacity to obtain three kilograms of cocaine. As with appellant Alston's other assertions of error, the determination of the quantity of cocaine involved in a conspiracy for the purposes of sentencing is a factual determination subject to the clearly erroneous standard.

"Under the Sentencing Guidelines, the amount of the drug being negotiated, even in an uncompleted distribution, shall be used to calculate the total amount in order to determine the base level." *United States v. Perez,* 871 F.2d 45, 48 (6th Cir. 1989). Guidelines section 2D1.4 states that "[i]f a defendant is convicted of participating in an incomplete conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." *See United States v. Roberts,* 881 F.2d 95, 104–05 (4th Cir.1989) (quantity of drugs sought in conspiracy, not amount actually obtained, is used to set offense level). The

7. *See United States v. Sanchez–Lopez,* 879 F.2d 541, 557 (9th Cir.1989) ("[w]hether a defendant is a 'minor' or 'minimal' participant in the criminal activity is a factual determination subject to the clearly erroneous standard.") (citations omitted). *United States v. Wright,* 873 F.2d 437, 444 (1st Cir.1989) (whether defendant is a minor or minimal participant is a "mixed question" of fact and law reviewed under clearly erroneous standard); *United States v. Nunley,* 873 F.2d 182, 187 (8th Cir.1989); (upholding denial of "minimal participant" reduction under clearly erroneous standard); *United States v. Buenrosto,* 868 F.2d 135, 137 (5th Cir.1989) (minimal participant status is question of fact reviewable under clearly erroneous standard).

**1370**

version of Application Note 1 to Guidelines § 2D1.4 in effect between November 1, 1987 and November 1, 1989,[8] states, in relevant part, that

> If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. Where the defendant was not reasonably capable of producing the negotiated amount, the court may depart and impose a sentence lower than the sentence that would otherwise result. If the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable."

The conspiracy conviction, itself, is not before us; appellant claims instead that the

district court was erroneous in finding a three-kilogram, rather than a one-kilogram or six-ounce, conspiracy. Determining whether the evidence supported a finding that Alston and Brennon were "reasonably capable of producing the negotiated amount" requires a sensitive assessment of the facts by the district court.

Appellant Alston was present when his co-conspirator Brennon stated that he could deliver three kilograms of cocaine to Agent Carter. The evidence in this case indicates that although Brennon's "local source" would only give him one kilo, Brennan agreed, with Alston's enthusiastic support, to attempt to arrange for the delivery of several more kilos of cocaine through his Florida "contacts," or a combination of his "local" and Florida sources. The district court also heard other evidence at the sentencing hearing to indicate that the conspiracy involved a three-kilogram transaction.[9]

---

**8.** Application Note 1 of § 2D1.4 (Jan. 1988), quoted in the text, was amended effective November 1, 1989, so that if the defendant "did not produce and was not reasonably capable of producing the negotiated amount, the court *shall* exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." U.S.S.G. § 2D1.4, comment. (n. 1) (Nov. 1989) (emphasis added). Under the former application note, unlike the current one, the sentencing court was not *required* to exclude such quantities of drugs in calculating the base offense level. The text of § 2D1.4, also quoted in the text, was not amended.

The portion of Application Note 1 dealing with the scope of relevant conduct for co-conspirators was also amended effective November 1, 1989, to make § 2D1.4 conform to the § 1B1.3 provision for the treatment of "relevant conduct" in sentencing. Prior to the amendment, sentencing courts were instructed to determine the base offense level "only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable." *See* U.S.S.G. § 2D1.4, comment. (n. 1) (Jan. 1988). The amended version of Application Note 1 refers the reader to the November 1989 version of Application Note 1 to § 1B1.3, which now reads, in relevant part:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foresee-

able by the defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

The commentary to these 1989 revisions in the application notes states that they merely clarified §§ 2D1.4 and 1B1.3. We do not have occasion in this case, however, to consider the effect of those amendments.

**9.** Appellant Brennon was sentenced by a different district court than the one who sentenced Alston. In sentencing Brennon, Judge Edenfield made the following statement:

> I think there is sufficient evidence to indicate a three-kilogram conspiracy. In no way do I mean to undermine what Judge Bowen apparently found in the companion case with the companion defendant Alston. However, in trying to sit here and listen back and forth, I am more comfortable with finding as a matter of fact that in addition to the transaction that actually occurred; that is the ounce and grams, there was a one-kilo conspiracy.
>
> So I am going to drop that from 28 to 26. I want it specifically understood that I can understand why someone would be just as comfortable in finding a three-kilo conspiracy.
>
> In fact, that is probably more accurate if you really want to meet the criteria of the sentencing guidelines ...

Appellant Alston, of course, has no standing to challenge the sentence received by appellant

The district court was not clearly erroneous in finding that Brennon was "reasonably capable of producing the negotiated amount." U.S.S.G. § 2D1.4, comment. (n. 1) (Jan. 1988).

 3. The propriety of considering quantities of drugs not included in the count upon which the defendant is convicted.

■ Appellant Brennon pled guilty to one count of distributing four ounces of cocaine to Agent Carter and agreed to testify against appellant Alston in exchange for the government's agreement to dismiss a conspiracy count and other related charges. At sentencing for the count to which he pled guilty, the district court considered evidence that Brennon was involved in a conspiracy to distribute a quantity of cocaine ranging from one kilogram to five kilograms.[10] The court noted that although there was substantial evidence that Brennon was involved in a three-kilogram conspiracy, it would find as a matter of fact that the conspiracy encompassed the sale of only one kilogram. Thus, the district court determined the base offense level for the count of conviction on the basis of the total amount of cocaine involved in the scheme and not merely the four ounces charged in the count to which Brennon had entered his plea.

We hold that the district court was correct in considering the total quantity of cocaine involved in the "same course of conduct or common scheme or plan as the offense of conviction" under Sentencing Guidelines § 1B1.3(a)(2). In so doing, we join six out of seven circuits that have addressed this question. *See United States v. Blanco,* 888 F.2d 907 (1st Cir. 1989); *United States v. White,* 888 F.2d 490 (7th Cir.1989); *United States v. Fernandez,* 877 F.2d 1138 (2d Cir.1989); *United States v. Mann,* 877 F.2d 688 (8th Cir. 1989); *United States v. Sailes,* 872 F.2d 735 (6th Cir.1989); *United States v. Sarasti,* 869 F.2d 805 (5th Cir.1989). *Cf., United States v. Scroggins,* 880 F.2d 1204 (11th Cir.1989) (upholding district court's consideration of 18 postal thefts to which defendant did not plead guilty and for which government agreed to drop charges, as conduct relevant in calculating a sentence).[11] *But see United States v. Restrepo,* 883 F.2d 781 (9th Cir.1989) (forbidding sentencing consideration of drug amounts not reflected in the offense of conviction).

The facts at issue in the *Blanco* decision are almost identical to those involved in this case. Mr. Blanco pled guilty to possessing with intent to distribute 125 grams of cocaine. The government recommended dismissal of other counts which charged Blanco with conspiring to distribute a larger amount of cocaine during the same time period he possessed with intent to distribute the 125 grams of cocaine. Just as appellant Brennon asserts in this case, Mr. Blanco argued that the Guidelines do not permit a sentencing judge to take into account conduct not covered by the counts of

Brennon. As was the case prior to enactment of the Sentencing Guidelines, sentencing involves to a large extent fact-finding. Therefore, one judge may, without committing error, interpret the facts to support a finding that the conspiracy involved a greater quantity of drugs than another judge might find in interpreting the same facts. Indeed, this reality explains and justifies the application of the clearly erroneous standard to factual determinations made within the sentencing process.

10. The five-kilogram figure derives from the fact that there was some discussion of getting enough kilograms at approximately $20,000 per kilogram to make use of the entire $100,000 Carter had available to make a deal. It was determined at Brennon's sentencing hearing that the parties actually settled on three kilograms at most, and possibly only one kilogram if Brennon could not get more from his "local" and Florida sources.

11. *Scroggins* is not directly applicable to the facts of this case, however, since the defendant in *Scroggins* did not contest that he committed the other 18 postal thefts. The *Scroggins* court nevertheless stated that if the defendant had claimed that he was innocent of the uncharged postal thefts the "sentencing court would have had to weigh the evidence and decide whether the appellant had committed the thefts." 880 F.2d at 1211 n. 18. Thus, the *Scroggins* court implied that even if the defendant had claimed that he was innocent of the uncharged conduct, such evidence could have been considered in determining the base offense level for the charge of conviction if there was sufficient evidence to support a finding that the defendant did in fact commit such offenses.

conviction. The *Blanco* court analyzed the question as follows:

[Defendant Blanco] notes that the additional drugs in question here were not covered by Counts I, II and III, to which he pled guilty, but, rather, they were the subject of other counts of the indictment (Counts IV, V, and VI), which the Government dropped. *The Guidelines, however, specifically instruct the court to take conduct of this sort into account when the crime at issue concerns drugs.* They say that:

> (i) [T]he base offense level where the guideline specifies more than one base offense level ... shall be determined on the basis of the following: ... (2) solely with respect to offenses of a character for which § 3D1.2(d) [the "fungible items/drugs/money" part of the "multiple counts" guideline] would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.

Guidelines § 1B1.3(a) (emphasis added). Let us apply this language mechanically: (1) the drug guideline relevant to this case, § 2D1.1, is a guideline that has many different "base offense levels," each correlated with a different amount of drug (e.g., the "base offense level" corresponding to "500 grams to 1.9 kilograms" of cocaine is 26). (2) A glance at the relevant cross-reference in the "multiple-count" guideline § 3D1.2(d) reveals § 2D1.1 listed there as "fungible items" crime. *See* Guidelines Ch. 1 Pt. A4(e). And, (3) the court properly found that the extra drugs at issue here were part of the "same course of conduct or common scheme or plan as the offense of conviction." Indeed, the Guidelines commentary specifically says that "in a drug distribution case, quantities and types of drugs not specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of a common scheme or

plan as the count of conviction." Guidelines § 1B1.3(a)(2), background commentary. Hence, the court must apply § 1B1.3 to determine the proper "base offense level," ....

*Blanco*, 888 F.2d at 909 (emphasis added).[12]

The idea that a sentencing court may consider conduct not covered by the counts of conviction is neither new nor radical. Prior to the enactment of the Guidelines, sentencing courts relied upon such information in arriving at sentences. *See McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986). That practice was acknowledged and incorporated into the sentencing calculus prescribed by the Guidelines. As long as the drugs not included in the count(s) of conviction are part of the "same course of conduct or common scheme or plan as the offense of conviction," there is nothing improper about applying the Guidelines in this manner to determine the base offense level for the count(s) of conviction.

The sentence imposed is limited to that provided in the Guideline applicable to the specific crime of which the defendant stands convicted. If the "real offense" characteristics found to apply constitute crimes themselves, the defendant is not exposed to another sentence because of them. If the government wishes the defendant to be sentenced for that conduct, the government must obtain a conviction. Nevertheless, the "real offense" characteristics may be taken into consideration in determining the base defense level and sentence that applies to the particular crime for which the defendant was convicted. *See Blanco*, 888 F.2d at 911. *See also*, Bryer, *The Federal Sentencing Guidelines and the Key Compromise Upon Which They Rest*, 17 Hofstra L.Rev. 1, 8–12, 25–28 (1988).

4. The standard of proof for conduct not covered by the counts of conviction.

 Appellant Brennon suggests in his Statement of the Issues that even if under

---

**12.** As noted in footnote 7, the application notes accompanying § 1B1.3 were the subject of certain amendments effective November 1, 1989.

the Guidelines a sentencing judge can consider conduct not covered by the count(s) of conviction, the Due Process Clause requires that such conduct be proven beyond a reasonable doubt. We disagree. The *Blanco* court rejected a similar argument. *See* 888 F.2d at 909. *See also McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986) (pre-guidelines sentencing court found facts without any prescribed burden of proof at all; preponderance standard satisfies due process requirements); *United States v. White*, 888 F.2d 490, 499 (7th Cir.1989) ("Guidelines' standard for resolving disputes is a preponderance of the evidence, not beyond reasonable doubt"); *United States v. Wright*, 873 F.2d 437, 441–42 (1st Cir.1989) (sentencing court can rely upon facts proven by a "preponderance of evidence"); *United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir.1987), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987) (disputed allegations in presentence report to be evaluated by preponderance standard). *See also* U.S.S.G. § 6A1.3 (Jan. 1988) (sentencing court may consider all relevant information that has "sufficient indicia of reliability to support its probable accuracy").[13]

Appellant Brennon's other allegations of error are without merit and do not warrant discussion.

## CONCLUSION

The judgment of the district court is AFFIRMED.

HATCHETT, Circuit Judge, specially concurring:

I write separately to describe the kind of record evidence a defendant must produce to facilitate a meaningful review of a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) claim.

Under *Batson v. Kentucky*, a defendant in a criminal case has the initial burden of establishing a prima facie case of race discrimination in the jury selection process.

Once the defendant establishes a prima facie case, the burden shifts to the prosecution to articulate a neutral explanation for challenging Afro–American (black) jurors. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. The prosecutor cannot rebut the defendant's prima facie case by merely denying a discriminatory motive or affirming that the actions were taken in good faith. Rather, the prosecutor must articulate a neutral explanation related to the particular case to be tried. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. The prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

The district court determines whether the defendant has established a prima facie case of race discrimination and whether the prosecutor has articulated a neutral explanation for removing each of the excluded black jurors. *United States v. David*, 844 F.2d 767, 769 (11th Cir.1988). On review, we will uphold the district court's findings unless they are clearly erroneous. *David*, 844 F.2d at 769.

In this case, the district court found that Alston met his burden of establishing a prima facie case of race discrimination because the prosecutor used four of six peremptory strikes to remove four of five black jurors. The district court also found that the prosecutor articulated neutral and legitimate reasons for removing the jurors. Thus, the district court concluded that the prosecutor complied with *Batson*.

Alston contends that the prosecutor's explanations for removing black jurors were pretextual, and therefore legally insufficient to satisfy the requirements of *Batson*. The government, on the other hand, contends that the prosecutor complied with *Batson* by articulating a neutral explanation for striking each of the excluded black jurors. According to the government, the four black prospective jurors were removed for one or more of the following reasons: (1) knowledge of the defendant or co-defen-

**13.** Effective November 1, 1989, § 6A1.3 is designated as a policy statement rather than an actual Guideline.

dant; (2) a family member who had been charged in a drug offense; (3) family members who were involved in law enforcement; (4) elderly and/or hard of hearing; and (5) unemployed.

The district court's finding that the government has rebutted a prima facie case of discrimination turns on an evaluation of the prosecutor's credibility, and thus, is given great deference. *See David*, 844 F.2d at 769. Notwithstanding the deference given to the district court's findings, we will not hesitate to strike down arbitrary and vague explanations. For example, in *United States v. Horsley*, 864 F.2d 1543 (11th Cir.1989), the court concluded that the explanation "I just got a feeling about him" is legally insufficient to refute a prima facie case of purposeful racial discrimination. *Horsley*, 864 F.2d at .1546. Likewise, pretextual explanations are legally insufficient to refute a prima facie case of discrimination. *See United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) (recognizing that a prosecutor's removal of black jurors for "seem[ingly] legitimate reasons" may be legally impermissible if the defendant can point out "that the stated reasons were pretextual because others similarly situated were allowed to serve."); *United States v. Wilson*, 853 F.2d 606, 610 (8th Cir.1988) ("in order to have a neutral explanation, the characteristics of the struck individual cannot be present in those white panel members not struck by the Government.").

When an allegation of pretext is raised, the defendant bears the burden of convincing the district court that the proffered reasons are pretextual by introducing evidence of comparability. To do so, the defendant must be allowed "the opportunity to offer rebuttal evidence pertaining to the Government's reasons." *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987) (holding that the defendant was entitled to a hearing on remand because the district court failed to make an independent inquiry or allow the defendant to offer rebuttal evidence pertaining to the government's reasons).

A defendant who seeks to establish pretext may attack the government's reasons by direct, objective, or otherwise concrete evidence. The defendant may also rely on other subjective or testimonial evidence which can only be determined by assessing the credibility of the evidence. We can better review a *Batson* claim based on pretext where the underlying claim involves "concrete" evidence (e.g., old age, prior criminal history, knowledge of witnesses, etc.), rather than subjective evidence. In cases involving "concrete" evidence, the defendant is not relying heavily on credibility choices but rather on objective facts easily discovered and presented. In cases "in which the evidence [is] largely testimonial, and the district court ha[s] the advantage of observing the witnesses and evaluating their credibility firsthand," we will rely heavily on the district court's credibility choices. *Lincoln v. Board of Regents of University System of Georgia*, 697 F.2d 928, 939 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

If the defendant alleges that the prosecutor's reasons are pretextual because the prosecutor failed to strike white jurors who possessed similar "concrete" characteristics as the black jurors who were removed, the district court must allow the defendant to establish those facts. *See Gordon*, 817 F.2d 1538. Such a showing need not turn into a full blown trial. But, the hearing must provide an adequate record to enable this court to conduct a meaningful review of the district court's findings.

In this case, Alston sought to establish pretext based on both "concrete" facts and other evidence. Despite his allegations, Alston's claim fails because the record reveals that he did not satisfactorily establish "concrete" facts for comparison—i.e., the age of all jurors, a list of jurors who had family members who were involved in drugs, or a list of jurors who had knowledge of the defendant or co-defendant. Because he failed to make the requisite showing, I conclude that the district court properly rejected the *Batson* claim.

The lesson to claimants of *Batson* violations and prosecutors is that comparisons

must be made between the black jurors removed from jury service and the white jurors remaining for service.