78 F.3d 585
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Lamont BARKSDALE, Defendant-Appellant.
 No. 95-1212.
 United States Court of Appeals, Sixth Circuit.
 Feb. 15, 1996.
 
 Before: MERRITT, Chief Judge and BATCHELDER, Circuit Judges; and DOWD, District Judge*.
 I. Introduction.
 PER CURIAM.
 
 
 1
 This appeal from the defendant's sentence following his guilty plea raises issues of relevant conduct and the interplay, if any, between the terms of a proffer letter that resulted in the government's post-indictment interview of the defendant and the subsequently executed written guilty plea agreement which contained provisions inconsistent with the terms of the proffer letter.
 
 
 2
 II. Factual Background.
 
 
 3
 The defendant-appellant James Lamont Barksdale was indicted on March 15, 1994. In count one of the indictment he was charged with co-defendant Gerold Vincent Irwin with a conspiracy beginning "sometime in June 1993 until about August 19, 1993" to distribute and to possess with intent to distribute cocaine base and in count three with possession with intent to distribute cocaine and cocaine base on the last day of the conspiracy period, i.e. August 19, 1993.
 
 
 4
 Barksdale was arraigned on June 28, 1994 and he entered a plea of not guilty. Subsequently, Barksdale submitted to an August 25, 1994 interview by the Assistant United States Attorney prosecuting the case and federal law enforcement officers pursuant to the July 1, 1994 proffer letter which provided in part as follows:
 
 
 5
 (1) Your client agrees to make a complete and truthful statement of your client's knowledge of the subject of the investigation and other targets the government may be interested in investigating. Your client agrees to cooperate in good faith, meaning that your client will not only respond truthfully and completely to all questions asked, but will also volunteer all information that is reasonably related to the subjects discussed in the debriefing. In other words, your client may not omit facts about crimes, participants, or his or her involvement, and then claim not to have breached the agreement because he or she was not specifically asked questions about those crimes, participants, or involvement. Any actions or statements inconsistent with continued cooperation under this agreement, including but not limited to, criminal activity, or a statement indicating a refusal to testify, constitutes a breach of this agreement.
 
 
 6
 ....
 
 
 7
 (5) No statement or information from your client will be used to enhance his sentence under the guidelines. However, there will be no restrictions on the use of information: (a) previously known to the government; (b) revealed to the government (or discoverable) through an independent source: .... (Emphasis added).
 
 
 8
 On October 12, 1994 consistent with a written plea agreement, Barksdale entered a plea of guilty to Count 3, the substantive drug offense. The plea agreement indicated that relevant conduct could be considered in determining the sentence and also contained an integration clause indicating that no other agreements existed. The agreement also contained as an appendix a calculation of the anticipated offense level and the criminal history which placed the sentencing range at 168 to 210 months.
 
 
 9
 The pre-sentence report described the offense conduct as follows:
 
 
 10
 6. Individuals from the Flint Police Department Special Operations Bureau and the Bureau of Alcohol, Tobacco, and Firearms (AFT) were investigating the distribution of cocaine in the city of Flint.
 
 
 11
 7. On August 6, 1993, Sergeant Colin Perry and ATF agent Mark Kloostra met with a confidential informant who indicated he had a source where crack cocaine could be purchased. The confidential informant later met with the individual, identified as Gerold Vincent Irvin, and purchased $250.00 of crack cocaine.
 
 
 12
 8. During this controlled purchase, investigators observed Mr. Irvin leave his residence and travel to 2419 Kellar. It appeared that Mr. Irvin's source of supply resided at that location.
 
 
 13
 9. On August 19, 1993, a federal search warrant was executed at 2419 Kellar, the residence of JAMES LAMONT BARKSDALE. Items seized from this residence included $4,631.00 in cash, cocaine, .22 caliber ammunition, and other narcotic related paraphernalia.
 
 
 14
 10. Gerold Irvin gave a written statement to investigators after they executed a search warrant at his residence of 2614 Trumbull. Irvin stated that he was recruited by JAMES BARKSDALE to sell crack cocaine. The defendant would provide Mr. Irwin with 1/4 ounce quantities of crack cocaine approximately once per week over a period of about three months.
 
 
 15
 11. JAMES BARKSDALE also provided information to investigators. He stated he began to use crack cocaine after his release from state prison in 1991. From February or March of 1992 until August of 1992, he sold approximately 1.5 grams of crack cocaine per week.
 
 
 16
 12. Between September of 1992 and May of 1993, the defendant sold approximately 3 grams of crack cocaine per week. Beginning in May of 1993, the defendant began his relationship with Gerold Irvin and provided 1/4 ounce quantities of crack cocaine every eight to nine days. The defendant recalled selling 1/4 ounce quantities of cocaine to other individuals on seven or eight occasions.
 
 
 17
 Joint Appendix at pp. 47 and 48. (Emphasis added).
 
 
 18
 As a consequence to the Offense Conduct, the presentence report summarized the drug quantities used to compute the Offense Level in paragraphs 13 and 14 which stated:
 
 
 19
 13. There were 5.88 grams of crack cocaine and 137.25 grams of cocaine powder seized at the defendant's residence during the execution of the search warrant on August 19, 1993. The defendant estimated that he distributed approximately 244 grams of crack cocaine. This information was substantiated by codefendant Gerold Irvin.
 
 
 20
 14. For guideline purposes, the Probation Department will use 250.11 grams of crack cocaine and 137.25 grams of cocaine powder in determining the offense level. Per Section 2D1.1 of the guidelines, these amounts will be converted into marijuana equivalents.
 
 
 21
 Barksdale's counsel entered no pre-sentence hearing objections to the revised January 4, 1995 pre-sentence report which calculated the base offense level at 34 in the following calculation:
 
 
 22
 Base Offense Level: The guideline for 21 U.S.C. § 841 is found in Section 2D1.1 of the guidelines. Since both crack cocaine and cocaine powder were seized, the guidelines call for a conversion to marijuana equivalents. 250.11 grams of cocaine base convert into 5,002.2 kilograms of marijuana. The 137.25 grams of cocaine powder convert to 27.45 kilograms. The total amount of marijuana equivalence is 5,029.65 kilograms. Between 3,000 and 10,000 kilograms of marijuana result in a base offense level of 34.
 
 
 23
 Joint Appendix at p. 49.
 
 
 24
 However, at the January 23, 1995 initial sentencing hearing, Barksdale's counsel objected to paragraphs 11 and 12 of the offense conduct and stated her position that only the cocaine and cocaine base seized on August 19, 1993 should be considered in determining the base offense level. Consequently, the district court continued the sentencing hearing until February 1, 1995.
 
 
 25
 On January 31, 1995, counsel for both parties filed briefs in anticipation of the rescheduled sentencing hearing. Barksdale's counsel alluded to the July 1, 1994 proffer agreement and the representation set forth in paragraph 5 to the effect that no information from the interview of the defendant would be used to enhance his sentence under the Guidelines and concluded with the request that the defendant be sentenced only with respect to the quantities of crack cocaine and cocaine powder seized during the execution of the search warrant at his residence on August 19, 1993.
 
 
 26
 The government's response to the objection of the presentence report agreed that the August 25, 1994 interview of the defendant had taken place and further contended that the government was not bound by the proffer letter in that the defendant had breached the agreement by refusing to discuss his drug sources and contested the defendant's argument that it was improper to hold him accountable for "relevant conduct."
 
 
 27
 The February 1, 1994 sentencing hearing was not evidentiary in nature. Rather the district court engaged in a colloquy with counsel. Counsel for the government set the stage by stating that the threshold issue was whether Barksdale's admissions regarding his drug distribution prior to the initial date in the indictment should be used by the court.[1]
 
 
 28
 At that point the district court interjected the belief that the Base Offense Level was only 32 if the pre-indictment conduct was not used. As the colloquy continued, Barksdale's counsel maintained that his admissions during the interview with the U.S. Attorney should not be used and that the statements of the co-defendant Gerold Vincent Irwin as to Barksdale's activity were not reliable while conceding that the principles of relevant conduct mandated consideration of Barksdale's conduct on other than the date of the substantive offense to which he entered his guilty plea.[2]
 
 
 29
 Then the district court observed that Irwin indicated that he had received 113.4 grams of cocaine base from Barksdale and Barksdale had stated that during the indictment period he sold 62 grams to Irwin and 50.23 grams to others. To that observation, Barksdale's counsel responded:
 
 
 30
 Well, I agree with the 62 grams that Mr. Barksdale admitted to himself providing to Mr. Vincent, but the other 49.63 grams was substance from the interview, and I don't believe those quantities should be used.
 
 
 31
 Your Honor, I'm not being difficult and I just would ask the Court to consider my argument because I do believe that my argument is valid and Mr. Barksdale has a right to be sentenced on information that he gave, and if he gave information on the condition that the information would not be used to enhance his guidelines, then I don't think that should be used.
 
 
 32
 Joint Appendix at p. 107.
 
 
 33
 After the court observed that Barksdale's information was not enhancing his guidelines, counsel for the government commented as follows:
 
 
 34
 Your Honor, Ms. Long made the same arguments to me last summer during plea negotiations. At that time, I told her that the government wanted to alleviate having a long evidentiary hearing and that we should make efforts to agree to a quantity before plea agreement was signed. That's why the government offered to listen to her client's version. He was not cooperating on any other matter. The proffer was solely to determine the amount of drugs that would be attributable to Mr. Barksdale, the only reason.
 
 
 35
 When we figured out all of the total quantity that Mr. Barksdale told us, it was a little bit less than what Mr. Irvin told us. Ms. Long agreed that we would submit Mr. Barksdale's figures to probation, those would be the figures that would be used in determining the amounts in the presentence report.
 
 
 36
 The plea agreement had the work sheets attached. There were no disputed items to those work sheets. When I thought that we had resolved this issue on the day of sentencing last week, Ms. Long is trying to make the same arguments that she had agreed with me last summer that there was no dispute on it. I just don't understand this whole matter.
 
 
 37
 Joint Appendix at pp. 107, 108.
 
 In response, defendant's counsel replied:
 
 38
 Well, we conducted the interview. The interview was not done specifically to see what Mr. Barksdale did for sentencing, but what Mrs. Juhasz said to me is that I will not make an offer until Mr. Barksdale gives me an interview because I want to see if there's enough information to make an offer with. If he didn't do anything, then he can't plead guilty to the court.
 
 
 39
 Now, Mr. Barksdale says to me the 113 grams that Gerald says, he would agree to that. The 113, but not the 250.
 
 
 40
 Joint Appendix at p. 109.
 
 
 41
 Following that reply the district court declared:
 
 
 42
 Well, I'm sorry, Ms. Long, but whether I take Mr. Irvin's statement from the PSC or Mr. Barksdale's own statement, it still adds up to virtually the same amount of cocaine base putting the base level here at 32 which is--I mean, I'm going to agree that the preindictment amount will not be counted. It's a 32 base level instead of the 34 that the presentence report goes through.
 
 
 43
 Joint Appendix at p. 109.
 
 
 44
 As a consequence of ignoring the pre-indictment admissions of Barksdale for the purpose of calculating relevant conduct, the adjusted offense level was decreased from the plea agreement calculation of 31 to 29 and the criminal history from VI to V and the sentencing range was decreased from 168 months to 210 months to the reduced range of 140 to 175 months and the district court imposed a sentence of 140 months.
 
 
 45
 III. The Defendant-Appellant's Claims.
 
 
 46
 Barksdale contends on appeal that the U.S. Attorney breached the plea agreement; that the breach violated his due process rights; and that Barksdale's statements regarding his past drug activities should not have been used to calculate his offense level.
 
 
 47
 IV. The Ruling.
 
 
 48
 Barksdale's claim that the plea agreement was breached implies that the terms of the proffer letter are an integral part of the subsequently executed written plea agreement. We reject the implication and the claim. "A defendant's plea agreement consists of the terms revealed in open court ..." Baker v. United States, 781 F.2d 85, 90 (6th Cir.), cert denied, 479 U.S. 1017 (1986). No mention of the proffer letter was communicated to Judge Edmunds when she accepted Barksdale's guilty plea on October 12, 1994 after a painstaking compliance with Rule 11 of the Federal Rules of Criminal Procedure. Moreover, the written plea agreement specifically advised Barksdale and his counsel that his "relevant conduct" would be considered in determining his sentence and the worksheet attached to the plea agreement clearly indicated that Barksdale's conduct preceding the date of the substantive offense on August 19 was being calculated into the sentencing range. Finally, the written plea agreement contained an integration clause which served to nullify the terms of the proffer letter. Consequently, we need not consider the government's claim that Barksdale breached the terms of the proffer letter. The claims of Barksdale that the United States Attorney breached the plea agreement and that the breach violated his due process rights are without merit.
 
 
 49
 The apparent purpose of the appeal is to seek a remand to sentence Barksdale only for the conduct involved in Count 3 to which he entered a plea of guilty. However, the Sixth Circuit is in the majority of circuits holding that a sentencing court may take into account relevant criminal conduct in counts that were dismissed as part of a plea bargain.
 
 
 50
 In U.S. v. Smith, 887 F.2d 104 (6th Cir.1989), the defendant was the subject of a two-count indictment charging 1) possession of four ounces of cocaine with intent to distribute, and 2) possession of ten grams of cocaine base with intent to distribute. He pleaded guilty to Count One in exchange for dismissal of Count Two. In the presentence report the probation officer calculated a sentence range under the federal sentencing guidelines based upon the total drug quantities in the two counts. The district court ruled that the sentence should be calculated based only on drug quantities charged in Count One, holding that
 
 
 51
 the conduct necessary to support inclusion in the Base Offense Level must be established by a finding of the jury, a plea of guilty confirmed by a finding of guilt in open court, or a stipulated offense other than the offense of conviction on a plea of guilty or nolo contendre ...
 
 
 52
 The Sixth Circuit reversed, noting that the sentencing guidelines defined "relevant conduct" as conduct that was "part of the same course of conduct, or a common scheme or plan, as the offense of conviction." Smith, 887 F.2d at 106. The Court held that the defendant's possession of the drug quantities charged in Count Two clearly fit this definition and therefore should be considered "relevant conduct" for sentencing purposes. Id. at 106-07.
 
 
 53
 This conclusion is supported by Sentencing Guideline § 6B1.2(a), which states in part, "[A] plea agreement that includes the dismissal of a charge or a plea agreement not to pursue a potential charge shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted."
 
 
 54
 Other Sixth Circuit support includes U.S. v. Cullens, 67 F.3d 123, 125 (6th Cir.1995) ("[T]he court may consider 'relevant conduct' alleged in ... dismissed counts in arriving at an appropriate sentence") and U.S. v. Pierce, 17 F.3d 146, 150 (6th Cir.1994) (involving uncharged rather than charged but dismissed conduct).
 
 
 55
 Support outside the Sixth Circuit for considering charged but dismissed conduct if relevant include U.S. v. Fine, 975 F.2d 596, 601-04 (9th Cir.1992) (en banc) (to determine base offense level); U.S. v. Quintero, 937 F.2d 95, 97 (2d Cir.1991); U.S. v. Rodriguez-Nunez, 919 F.2d 461, 464 (7th Cir.1990); U.S. v. Williams, 917 F.2d 112, 114 (3d Cir.1990), cert. denied, 498 U.S. 1102 (1991); U.S. v. Rutter, 897 F.2d 1558, 1562 (10th Cir.), cert. denied, 498 U.S. 829 (1990); U.S. v. Alston, 895 F.2d 1362, 1371-72 (11th Cir.1990); U.S. v. Blanco, 888 F.2d 907, 909-11 (1st Cir.1989); U.S. v. Williams, 880 F.2d 804, 805 (4th Cir.1989); U.S. v. Taplette, 872 F.2d 101, 106-07 (5th Cir.), cert. denied, 493 U.S. 841 (1989).
 
 
 56
 The court correctly applied the well established concepts with respect to "relevant conduct." The Court had the option of considering either the admissions of Barksdale or alternatively the statements of the co-defendant Gerold Vincent Irwin on the subject of Barksdale's drug activity during the period of time in the charged but dismissed the first count of the indictment. By either calculation, the court correctly determined that the Base Offense Level was 32.
 
 
 57
 The defendant's sentence to imprisonment for 140 months is AFFIRMED.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Paragraph 12 of the Offense Conduct in the pre-sentence report covered periods prior to the alleged beginning date of June, 1993 as set forth in the conspiracy allegations in the dismissed Count 1
 
 
 [2]
 During the colloquy, Barksdale's counsel stated:
 And he was trying to get his sentence, so he gave this information to save his own self from a high incarceration period. So I just feel that, number one, Mr. Vincent [Irwin] probably provided different quantities during the interview than he provided in his written statement which I do have a copy of.
 So based on that, I'm not saying that we should not use relevant conduct. That's never been my argument. I've never said that to anybody but I don't believe that we should just pull a figure out of a hat which--I just feel that that's what's been done here. Not so much pulled the figure out of the hat, but the figure that they've used shouldn't be used because those particular quantities were not to have been used from the interview. Now we go back and look at Gerald's. Well, I don't think we have a good--
 Joint Appendix at p. 106.