[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14787

_____

D.C. Docket No. 8:14-cr-00262-EAK-JSS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARK JOSEPH UNREIN,

Unrein - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 2, 2017)

Before WILSON and ANDERSON, Circuit Judges, and ROTHSTEIN,* District
Judge.

---

*Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of
Washington, sitting by designation.

PER CURIAM:

## I.    INTRODUCTION

Mark Joseph Unrein challenges his conviction for one count of attempting to entice a minor to engage in a sexual act, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252. On appeal, Unrein argues four errors.  Specifically, Unrein argues that the district court improperly denied his motion to sever the charges; precluded him from presenting an entrapment defense; admitted evidence that Unrein claims is irrelevant and unduly prejudicial; and denied his motion for a mistrial based on prosecutorial misconduct.  For the following reasons, we affirm.

## II.    FACTUAL BACKGROUND

The salient facts to this appeal are as follows.  On May 8, 2014, Homeland Security Special Agent Renee McAteer was working as part of a law enforcement operation targeting people using the Internet to sexually-exploit children.  As part of this operation, Agent McAteer posted an online advertisement ("ad") in Craigslist's[1] "strictly platonic" subsection titled, "Spend some time with two cute girls."  In the ad, Agent McAteer posed as a "very open minded" "single mom"

---

[1] Craigslist is a classified advertisements website with sections devoted to, *inter alia*, "personals."  In any given section, Craigslist users can anonymously post ads soliciting various types of services and relationships; and users can respond—from a personal email account—to any post.  There are nine subsections in "personals," including: "men seeking women;" "men seeking men;" and "strictly platonic."

2

seeking a man to provide "masculine comparison" for her "beautiful" 12-year-old daughter.[2]

That same day, Unrein responded by email to the ad, writing that he was "very interested" and wanted to know what the poster "meant about being open minded" because he is "that way too." Unrein continued that he hoped to hear back about spending time "together for real." Agent McAteer emailed back, asking that Unrein tell her a bit about himself. Minutes later, Unrein emailed again, reiterating that he is "open minded" and that he could be "of great assistance" with the poster's daughter.

Without having received a response, Unrein sent another two emails over the next forty minutes. In these emails, Unrein expressed his "interest" and asked how he could be "of help" with the poster's daughter. Unrein urged that the poster tell him where she was "located," and assured her that he would "really like to make this happen." Unrein offered to "guide" the daughter, by showing her "attention and affection." The Agent finally responded, introducing herself as "April," and

---

[2] In full, the ad reads: "I am a very open minded and free spirited single mom. My daughter's dad is not in the picture at all. It is just us girls. I love my beautiful 12 yr old girl, and I just want a man to spend some time with us so that she can have some masculine comparison. She is at a curious age and I don't want her following the immature crowd. I want her to be her own person. Right now, she is still kind of timid and self-conscious. She needs some confidence building. Are you the right guy to help a mom out?" GX 1. At trial, Agent McAteer testified that she used the term "open-minded" because, based on her training, she knows it to be a key term that leads to "sexual communications."

writing that she wanted to "hear more" from Unrein.  As to how Unrein could be "of help," April wrote that that she was "open to suggestion."

Minutes later, Unrein responded.  In a series of emails over the next few hours, Unrein thanked April for "being an open minded Mom" for the daughter, whom the Agent named "Carly."  Unrein asked whether April would let him "spend time alone" with Carly.  When asked what Unrein planned to do with the daughter, Unrein responded that they should meet up and spend time together; once Carly got to know him, Unrein wrote, Carly could "stay overnights or on some weekends too."  In one email, April clarified that she herself did not need "affection;" it was Carly who "needs care and affection to feel special."  Unrein wrote that he understood.  When asked what "kind of affection" Unrein would show her daughter, Unrein replied that he would "talk with [Carly,] sit close, have her sit on [his] lap, hold her hands, hug, cuddle, and kiss her."

The next day, April emailed Unrein that he "sounded nice."  In response, Unrein twice asked when they could schedule a "meet up."  April, in turn, asked whether Unrein would "instruct" Carly about sex.  Unrein wrote that he would "answer any questions" Carly had; that he understood that Carly is "curious;" and that he would "help and guide her."  April gave Unrein her phone number.  Unrein called that evening.

4

In a series of calls that evening, April told Unrein that Carly was "very affectionate."  She asked Unrein whether he would be uncomfortable about having a 12-year-old girl ask him about sex.  Unrein said he had no problems "whatsoever" if Carly acted "very affectionate" towards Unrein.  Unrein said he would "absolutely" "fit in very well" with April's wanting Carly to experiment sexually in a "safe environment" with the "right kind of man."  In response to April's pointed questions, Unrein said that he had thought about "sex with a little girl" before; and that he had previously had "sex with a girl [Carly's] age before."  Unrein said he hoped his relationship with Carly would be "ongoing for a very long time."  When asked what Unrein would do with Carly the first night they met, Unrein responded that he and Carly could "share a bath" and that she could "spend the night in bed" with him.  If Carly wanted to "flirt and kiss and make out," Unrein explained, he was "open to anything" that Carly "may want to explore."  Unrein and April made plans for Unrein to visit the undercover house that night.

Unrein, however, worried that this was a sting operation.  To that end, he called April another four times that evening.  First, he asked to speak with Carly; and he asked whether April was a police officer.  April responded adamantly that she was not, but that Carly was in the shower.  Unrein said he would call back.  Approximately 15 minutes later, Unrein called and spoke with another undercover agent who pretended to be Carly.  Unrein asked Carly whether April had told her

5

that Unrein was "coming over to visit."  Carly said "yeah" and asked Unrein what

they were going to do.  Unrein responded that they would go into Carly's room and

decide there.  Unrein repeatedly told Carly not to be nervous.  When Carly said

that her mother had told her that Unrein was coming over to have sex with her,

Unrein asked, "Isn't that what you want?"  Speaking again with April, Unrein

confirmed that he would see them—in person—later that evening.  A few minutes

later, Unrein called for a third time telling April that this was a "dream come true,"

but that he had "this concern . . . about sting operations where these guys get

busted for trying to . . . get together with underage girls."  April repeatedly told

Unrein that Carly would be upset if he did not come over.  After a few similar

exchanges, Unrein said he would be there that night.

Unrein arrived at the undercover house less than two hours later.  After

seeing Unrein look in the windows and walk around the house, the Agent met

Unrein outside.  She told Unrein that Carly was inside; Unrein followed her in.

Unrein was arrested as he was walking in the front door.

Following Unrein's arrest, agents seized his home computer.  Law

enforcement computer analysts uncovered approximately 100 child pornography

images and 1,000 child erotica images on Unrein's computer.  At trial, individuals

who had used Unrein's computer in the past (including his ex-wife and his adult

children), testified that they had not used the computer to search for or download

6

child pornography.  Additionally, a computer analyst testified about the various methods by which the analyst could verify that the criminal images had been downloaded and stored using an account associated with Unrein's personal email, other photographs and search histories.  Analysts further recovered 21 Craigslist ads that Unrein had posted, and eight "strictly platonic" ads to which Unrein had responded.  All of these ads referenced consensual, adult sexual activity, including those posted in the "strictly platonic" section.

Following four days of testimony, the jury found Unrein guilty on both counts.

### III.    DISCUSSION

#### A. *Motion to Sever*

Unrein argues that the district court erred by denying his motion to sever the attempted child enticement charge from the possession of child pornography charge pursuant to Fed. R. Crim. Pro. 14.  Whether to grant a motion to sever "lies within the district court's sound and substantial discretion." *United States v. Lopez*, 649 F.3d 1222, 1235–36 (11th Cir. 2011).  We will not reverse a district court's denial "'absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection.'" *United States v. Ramirez,* 426 F.3d 1344, 1352 (11th Cir. 2005) (per curiam) (quoting *United States v. Walser,* 3 F.3d 380, 385 (11th Cir. 1993)).  We assess compelling prejudice by examining

7

"whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." *Walser*, 3 F.3d at 386–87 (11th Cir. 1993).

In his motion to sever, Unrein asserted that he had a "potential desire to testify regarding how the images of child pornography ended up on his computer." "Conversely," Unrein asserted, he "may decide to testify" regarding the attempted child enticement count but not testify regarding the possession of child pornography count. Thus, Unrein argued before the district court, that "the continued joinder of these two counts would result in [Unrein] having to remain silent on both, where he might have a viable defense as to one[,]" in violation of his Fifth Amendment right against self-incrimination. On appeal, Unrein adds only that he "may have wished" to testify "that he did not download child pornography on his hard-drive, so somebody else would have put it there."

However, "[s]everance is not mandatory simply because a defendant indicates that he wishes to testify on some counts but not on others." *Alvarez v. Wainwright*, 607 F.2d 683, 685 (5th Cir. 1979) (per curiam).[3] Instead, a defendant

---

[3]*Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old" Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit).

8

must make "a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.* at 686. This includes "present[ing] enough information regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other to satisfy the court that the claim of prejudice is genuine[.]" *Id.* at 686. Such "bare allegation[s] that [a defendant] wanted to testify with respect to one count but not with respect to the other g[ives] the trial judge no factual basis on which to evaluate possible prejudice." *United States v. Forrest*, 623 F.2d 1107, 1115 (5th Cir. 1980).

Unrein has made only bare allegations about his desire to testify. He has not proffered why his testimony on one count is important, nor his reason for wishing to remain silent on the other count. On appeal, Unrein references only the testimony of the Government's computer analyst, ostensibly arguing that the "write-block device" used to uncover the child pornography images may have "transmit[ted]" the criminal images on to Unrein's computer. To the extent that this proffer qualifies as important, we note that at trial, defense counsel cross-examined the analyst regarding this device. Moreover, severance would not have changed the analyst's testimony, nor Unrein's ability to cross-examine him. Similarly, Unrein cross-examined the witnesses with access to his computer, all of whom denied searching for and downloading child pornography images.

9

Accordingly, the district court did not abuse its discretion on Fifth Amendment grounds for refusing to sever the two counts. *See*, *e.g.*, *id.*; *United States v. Corbin*, 734 F.2d 643, 649 (11th Cir. 1984) (affirming refusal to sever where appellants "have done no more than express a generalized desire to testify as to some counts but not others"); *United States v. Montes-Cardenas*, 746 F.2d 771, 778 (11th Cir. 1984) (affirming refusal to sever where appellant "does not explain what testimony he would have proffered with respect to either charge, nor does he show why the joint trial prevented him from taking the stand").

Unrein nevertheless argues that it was "unfairly prejudicial to try the two charges together" for two reasons. First, the jury could have been "confused" by the fact that one charge was an enticement offense while the other involved possession of criminal images. Second, the jury may have "impermissibly considered proof" that Unrein was guilty of one offense to convict him of the other.

However, Unrein does not allege (or provide any proof of) how the jury was confused. Such "hypothetical" argument is insufficient to find an abuse of discretion based on jury confusion. *United States v. Barsoum*, 763 F.3d 1321, 1337-38 (11th Cir. 2014).

The district court instructed the jury that a "formal charge . . . is not evidence of guilt[;]" that each offense charged is "a separate crime[;]" that the jury

10

"must consider each crime and the evidence relating to it separately[;]" and that its finding of guilty or not guilty on one count "must not affect [its] verdict for any other crime."  "[I]f the possible prejudice may be cured by a cautionary instruction severance is not required." *Walser*, 3 F.3d at 387.

Thus, the district court did not abuse its discretion in refusing to sever the two counts. *See*, *e.g.*, *United States v. Zitron*, 810 F.3d 1253, 1258 (11th Cir. 2016) (per curiam); *United States v. Hersh*, 297 F.3d 1233, 1244 (11th Cir. 2002); *Walser*, 3 F.3d at 387.

## B. Entrapment

Unrein argues that the district court erred by precluding him from presenting an affirmative defense of entrapment.  Unrein did not submit any evidence to the district court in support of his argument that he was entitled to this defense; instead, he maintained that the Government's exhibits sufficiently indicated that the Government induced him to commit the attempted child enticement crime.  Similarly on appeal, Unrein does not request remand in order to introduce additional evidence of government inducement; he continues to argue that the record sufficiently demonstrates inducement.  The Government argues that Unrein does not demonstrate government inducement.  The Government additionally argues, though the district court found that there was no government inducement that would entitle Unrein to an entrapment defense, the trial court did not limit

11

Unrein's cross-examination, nor did it limit his closing argument in this regard. We review *de novo* whether a defendant presented sufficient evidence of government inducement to entitle him to an affirmative defense of entrapment.[4] *United States v. Davis*, 902 F.2d 860, 866 (11th Cir. 1990).

An affirmative entrapment defense "requires two elements: (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." *United States v. Brown,* 43 F.3d 618, 623 (11th Cir.1995) (citing *Mathews v. United States,* 485 U.S. 58, 61 (1988)). "The right to present the defense is conditional, since 'before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid entrapment defense must be present.'" *United States v. Ryan,* 289 F.3d 1339, 1343 (11th Cir. 2002) (per curiam) (quoting *United States v. Alston*, 895 F.2d 1362, 1367 (11th Cir. 1990)).  "In essence," the court must determine "whether a juror could entertain a reasonable doubt about whether the defendant was entrapped." *Alston*, 895 F.2d at 1367.

"[T]he defendant bears the initial burden of production as to government inducement." *Ryan,* 289 F.3d at 1343.  Though the defendant's burden is "light," "evidence of the government's mere suggestion of a crime or initiation of contact is not enough." *Brown*, 43 F.3d at 623.  "Instead, government inducement requires [that a defendant demonstrate] an element of persuasion or mild coercion." *Id.*

---

[4] It is the Government's position that this Court reviews the issue *de novo*.

If a defendant meets his burden, "the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Ryan*, 289 F.3d at 1343.  Attempted child enticement, in violation of 18 U.S.C. § 2442(b), requires proof beyond a reasonable doubt that a defendant intended to cause a minor "to assent to sexual contact with him" and "took a substantial step toward causing that assent." *United States v. Lee*, 603 F.3d 904, 914–15 (11th Cir. 2010).  A defendant may be properly convicted even when he "communicates only with an adult intermediary who can influence a minor." *Id.* at 915.

On appeal, Unrein maintains that the "record evidence indicates that [Unrein] had not favorably received the government's plan to meet at the [undercover] house so that he could entice a minor."  Rather, Unrein asserts, "the government had to 'push' the plan on him on at least two occasions," including when Unrein called April worried that the operation was a sting.  According to Unrein, the Agent's "feigning distress" over Carly's suffering if Unrein backed out "qualifies as legally sufficient evidence from which a reasonable juror could find government inducement."  Unrein mischaracterizes the evidence.

The Government, by way of Agent McAteer's ad, may have created the opportunity for Unrein to commit the crime of attempted child enticement.  Even so, the Agent posted the ad on a public website; it was Unrein who responded

directly.  Unrein, in his initial response, wrote that he was very interested, honed in on the word "open-minded," and "hoped" that he, the poster, and the poster's daughter could spend time together.  When the Agent responded with a brief request for Unrein to tell her about himself, Unrein not only responded, he sent three unanswered emails in the course of 45 minutes.  In these early emails, Unrein repeatedly wrote that he could be "of great assistance," asking where the poster was "located," assuring her that he really wanted to "show her [daughter] attention and affection," and "to make this happen."  In response to Unrein's pointed questions, the Agent twice responded that she was "open to suggestion" as to how Unrein could "be of help."  Unrein, in turn, repeated that he would show the daughter "affection," shortly thereafter writing that he would "talk with [the daughter,] sit close, have her sit on [his] lap, hold her hands, hug, cuddle and kiss her."

Over the course of just 24 hours, Unrein repeatedly reached out to "April," proposing that he visit her and "Carly," and suggesting specific and explicit sexual activities in which he and Carly could partake.  For example, when asked what Unrein would do with Carly, Unrein responded that she could "share a bath" with him and "if she wants to spend the night in bed" with him, she could.  "If she wants to flirt and kiss and make out," Unrein continued, he was "open to anything" that Carly "may want to explore."  When on the phone with Carly, Unrein asked

14

her about her day and told her not to be nervous. He said that they could "explore" whatever Carly was curious about; and asked "Isn't that what you want?" when Carly reported that April had said that she and Unrein would be having sex. Thus, "while the government's offers may have constituted opportunity, what is wholly lacking is evidence of 'opportunity plus something like excessive pressure.'" *Ryan*, 289 F.3d at 1345 (quoting *Brown*, 43 F.3d at 623) (emphasis omitted); *see also United States v. Alston*, 895 F.2d 1362, 1368-69 (11th Cir. 1990) (affirming denial of entrapment instruction where the defendant readily pursued the crime, "never once expressed even a distaste" for criminal activity, and the undercover agent did not pressure him into criminal activity); *United States v. Ventura*, 936 F.2d 1228, 1233 (11th Cir. 1991) (affirming denial of entrapment defense where defendant had "indicated no reluctance whatsoever" to engage in criminal act and agent did not coerce him).

Unrein's concern that April was an officer conducting a sting operation does not demonstrate the Government's pushing the plan on him; it demonstrates his criminal intent. *See United States v. Farley*, 607 F.3d 1294, 1334 (11th Cir. 2010) (defendant's criminal intent demonstrated by his repeated acknowledgement of "his awareness that what he planned to do was highly illegal"); *United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) (reasonable jury could have found from defendant's "constant concern" for whether an adult agent was conducting a sting,

15

that the defendant was interested in more than a platonic relationship with the daughter because "a relationship with [Agent], an adult, would not have concerned law enforcement"). Accordingly, the district court correctly determined that Unrein did not demonstrate government inducement of the attempted child enticement crime, thereby precluding him from presenting an entrapment defense. *See e.g.*, *Alston*, 895 F.2d at 1368-69; *Ventura*, 936 F.2d at 1233; *United States v. Hargrove*, 601 F. App'x 924, 924–25 (11th Cir. 2015) (per curiam).[5]

Moreover, "[w]here a defendant is predisposed to commit a crime, he cannot be entrapped." *United States v. Rey*, 811 F.2d 1453, 1455 (11th Cir. 1987) (citing *Hampton v. United States,* 425 U.S. 484 (1976), and *United States v. Russell,* 411

---

[5] Accordingly, Unrein's reliance *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 1999), is mistaken. The defendant in *Poehlman* was convicted of crossing state lines for the purpose of engaging in sex acts with a minor, after the jury heard (and rejected) his entrapment defense. Poehlman demonstrated that he had previously and repeatedly scoured the Internet in hopes of finding "like-minded adults" who shared his pension for cross-dressing and his fetish for feet. *Id.* at 695, 698. The Ninth Circuit detailed Poehlman's loneliness and depression, and the multitude of negative responses he had received from adults previously. When Poehlman answered the online ad of an undercover agent conducting an operation to catch child molesters, he expressed an interested in "a long-term relationship [with the poster] leading to marriage," and his only reference to children was that he "didn't mind" them. *Id.* at 698-699. "Even after [the agent] gave him an opening by hinting about 'not letting society's views stand in the way,' Poehlman continued to focus his sexual attentions on the mother and not the daughters." *Id.* at 699. The agent "eventually drew Poehlman into a protracted e-mail exchange which became increasingly intimate and sexually explicit." *Id.* at 700. The exchange lasted over six months, with the agent "cast[ing] [the sexual activity with her children] as an act of parental responsibility and the selection of a sexual mentor [in the defendant] as an expression of friendship and confidence . . . It is clear [however] that Poehlman continued to long for an adult relationship with [the agent]." *Id.* at 702. Accordingly, the Circuit Court overturned his conviction, finding that the government induced the crime, and that the jury's conclusion that Poehlman was predisposed to commit the crime could not be sustained. *Id.* at 705.

U.S. 423 (1973)).  Predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (internal quotations omitted).  Here, Unrein assured April that he had not only thought about sex with a child before, but that he had had sex with a child Carly's age before.  Unrein commented about "the key" to his long-term relationship with Carly, and took the initiative to suggest specific sexual acts in which he and Carly could engage.  He declined April's invitations to back out if he felt uncomfortable or otherwise did not want to show Carly affection. Accordingly, the Government presented more than enough evidence for a reasonable jury to find beyond a reasonable doubt that Unrein was predisposed to commit the crime. *See*, *e.g.*, *United States v. Brown*, 43 F.3d 618, 626 (11th Cir. 1995) (evidence of defendant's prior related offenses, his willingness and eagerness to commit crime, his familiarity with specifics of crime, and his declining chances to back out of crime demonstrated predisposition).

Furthermore, the jury did, in fact, hear Unrein's "story."  The district court did not limit Unrein's cross-examination or his closing remarks.  During his cross-examination of Agent McAteer, Unrein's counsel asked about the "hallmarks of a sting operation," and the Agent's: getting to "decide how the conversation is going to go;" bringing up the subject of sex; "selling an opportunity;" "trying to prompt

17

[Unrein] to say bad things;" "lay[ing] a guilt trip" on him; "how to guilt people to stay on board;" "lur[ing]" Unrein in; and "try[ing] to induce" him.  Also on cross-examination, Unrein's counsel suggested that the Agent's conduct was "like entrapment;" and that Unrein wanted only to serve as "a father figure" for Carly.  During his closing argument, Unrein's counsel repeatedly compared the Government's "sting operation" to "a production set [in] Hollywood," in which the agents were the producers following "a script."  Unrein's counsel also argued that the agents were "opportunistic" and "salesy," participating in "a big game."

### C. Evidentiary Rulings—Craigslist Ads

Unrein argues that the district court erred by admitting the 21 ads that Unrein posted on Craigslist, and the eight "strictly platonic" ads to which he responded.  Specifically, Unrein maintains, the ads involve casual sex between consenting adults, and Unrein was charged with offenses involving the sexual exploitation of children.  Alternatively, Unrein argues, any probative value was substantially outweighed by the ads' prejudicial nature.  Additionally, Unrein maintains, the ads constituted impermissible character evidence by exposing the jury to Unrein's "unusual sexual proclivities."[6]  "It is highly likely," Unrein contends, that the jury convicted based on their distaste for his unusual but lawful preferences.  The Government counters that the ads are relevant and probative of Unrein's intent to

---

[6] Unrein refers to the fact that in some of his 21 ads, he sought sexual activity with other men.

18

entice Carly into sexual activity because they demonstrate that Unrein used similar language in his adult-focused ads.  Further, the Government asserts, the ads demonstrate Unrein's knowledge that the "strictly platonic" subsection could be used to solicit sexual encounters.

The district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Docampo,* 573 F.3d 1091, 1096 (11th Cir. 2009), *cert. denied,* ⸻ U.S. ⸻, 130 S.Ct. 2342, 176 L.Ed.2d 564 (2010).  We will not reverse an evidentiary ruling if "sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case." *United States v. Khanani,* 502 F.3d 1281, 1292 (11th Cir. 2007) (internal quotations omitted).

Rule 403 "permits a district court to exclude otherwise relevant evidence if 'its probative value is substantially outweighed' by certain considerations, including the danger of unfair prejudice, confusion of the issues, or misleading the jury. *United States v. Sumner*, 522 F. App'x 806, 810 (per curiam) (quoting Fed. R. Evid. 403).  "Rule 403, however, constitutes 'an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility.'" *Sumner*, 522 F. App'x at 810 (per curiam) (quoting *United States v. Lopez,* 649 F.3d 1222, 1247 (11th Cir.2011)).

The district court correctly found that the ads demonstrate Unrein's knowledge that Craigslist in general—and the "strictly platonic" subsection in particular—could be used to arrange sexual encounters. *See, e.g.*, *Sumner*, 522 F. App'x at 810 (finding photographs containing lawful content relevant to defendant's intent and predisposition to commit attempted child enticement). Moreover, the district court instructed the jury on the proper purpose of other acts evidence, thereby lessening the possibility of their prejudicial impact. *See*, *e.g.*, *United States v. Smith*, 459 F.3d 1276, 1296 (11th Cir. 2006) (affirming as not overly prejudicial the admission of photographs of defendant, charged with producing an possessing child pornography, having sex with adults, especially where court gave instruction on evidence's proper purpose).

### D. Prosecutorial Misconduct in Closing Arguments

Unrein contends that the district court improperly denied his motion for a mistrial based on prosecutorial misconduct during closing arguments. We review a district court's denial of such a motion for abuse of discretion. *United States v. Thompson*, 422 F.3d 1285, 1297 (11th Cir. 2005). However, we generally review claims of prosecutorial misconduct *de novo*. *United States v. Flanders*, 752 F.3d 1317, 1332 (11th Cir. 2014). "But where a defendant fails to make a contemporaneous objection to the alleged misconduct in the district court, we review such claims for plain error." *Id.* (internal quotations omitted).

Unrein argues that the prosecutor made inflammatory and prejudicial remarks during her closing argument. Specifically, Unrein asserts, the following comments were improper: that Unrein "doesn't care about any scars he'll leave on the child;" that his actions would have haunted a victim forever; that Unrein "creeps around the house peering in windows;" and that the images found on Unrein's computer were "disgusting." At trial, Unrein objected to all of these remarks except for the remark regarding Unrein being one who "creeps around the house peering in the windows." Additionally, Unrein asserts, the prosecutor "attacked defense counsel personally" when she "accused defense counsel of misstating the law and misstating the evidence." The cumulative effects of these comments, Unrein argues, deprived Unrein of a fair trial.

21

A prosecutor's remarks during closing argument warrant reversal if the "remarks are (1) improper and (2) prejudicial to a substantial right of the defendant." *United States v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997) (per curiam). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). Prosecutorial misconduct is considered in the context of the entire trial, including any curative instruction. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "If the district court takes a curative measure," this Court reverses "only if the evidence is so prejudicial as to be incurable by that measure." *Id.* "We presume that the jury followed the district court's curative instructions." *Id.*

Here, the prosecutor's remarks concerning "scars" that would have been left—and "haunting" that would have occurred—by Unrein's intended actions, describe accurate, well-known consequences on victims such as "Carly." Accordingly, they are neither prejudicial nor improper. *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (prosecutor's remarks are not improper where they make "inferences fairly suggested by the evidence or by matters of common knowledge outside the evidence").

Similarly, the categorizations of the child pornography images as "disgusting," as well as Unrein's "creep[ing]" around the undercover house are, to say the least, fair and accurate. Indeed, Unrein's counsel, in his closing argument, also categorized the child pornography images as "disgusting."

Further, the district court instructed the jury that closing arguments are not evidence. Combined with the court's instruction, the prosecutor's remarks do not warrant reversal. *See, e.g.*, *Boyd*, 131 F.3d at 955; *United v Beasley*, 2 F.3d 1551, 1559-60 (11th Cir. 1993); *United States v. Wilson*, 149 F.3d 1298, 1302 (11th Cir. 1998).

## IV.    CONCLUSION

Accordingly, we **AFFIRM** Unrein's conviction.