NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0224n.06

No. 19-5361

<table>
<tr><td>UNITED STATES OF AMERICA,<br><br>    Plaintiff-Appellee,<br><br>v.<br><br>JAMES MICHAEL HOOD,<br><br>    Defendant-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>**FILED**<br>Apr 23, 2020<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE</td></tr>
</table>

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

BEFORE:    CLAY, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge.  James Hood was convicted by a jury of attempting to entice a minor to engage in criminal sexual activity and sentenced to 121 months' imprisonment.  Before trial, Hood moved for a judgment of acquittal, arguing that he was entrapped by the law enforcement agent who posed as his 17-year-old victim.  The district court denied the motion but agreed to submit the entrapment question to the jury.  Hood now appeals the denial of his motion for judgment of acquittal.  The motion was properly denied, however, because a rational jury could have found beyond a reasonable doubt that Hood was predisposed to commit the offense.

On June 28, 2017, James Hood sent a "friend request" on Facebook to J.H., a 17-year-old teen pageant contestant in Tennessee.  At the time, Hood was a 53-year-old divorced male who lived alone.  J.H. accepted the friend request, thinking that Hood might be a judge for the pageant.  J.H. had been soliciting votes for her pageant activities on her Facebook page.  Hood almost immediately began sending J.H. private messages through Facebook.  The first few messages were

about the pageant. Hood asked, "did u make it[?]" and promised, "I'll vote for u." J.H. responded appreciatively: "Thank you so very much!!!" Hood then said, "[y]ou are really beautiful and deserve to win," to which J.H. replied, "[y]ou are very sweet!"

Hood then asked a series of introductory questions a judge would normally ask a pageant contestant, such as whether J.H. was a junior or senior, what she did for fun, whether she had a boyfriend, whether she liked to read or watch movies, what her favorite food was, and whether she expected to win the pageant. When J.H. told Hood that she was 17 years of age, he responded, "[s]o young!!" Hood assured J.H. that he was "not trying to flirt" and said, "I promise I'm just interested in talking to u that's all I swear." Hood also sent messages that would not ordinarily come from a pageant judge. He asked, "can we really be friends[?] I like chatting with u," and inquired whether J.H. was a Christian. Hood showered J.H. with compliments, telling her that she was "a really beautiful young woman," and when J.H. told him that she was going dress shopping, commented, "I'm sure you look good in everything." Less than 24 hours after first contacting J.H., Hood asked J.H. if they could move their conversation to text messaging. J.H. declined and stopped messaging Hood. This caused Hood to worry that he had upset J.H., and he sent numerous messages apologizing and trying to assure her that he had good intentions. Hood's messages continued until 2:41 a.m. the next day. This caused J.H. to block Hood on Facebook and Instagram and report the conversation to her mother.

J.H.'s mother in turn reported the Facebook activity to the Knoxville Police Department. With J.H.'s mother's permission, Knoxville investigator Thomas Evans impersonated J.H. and renewed the conversation with Hood twelve days later on July 11, 2017. Evans instructed J.H.'s mother to temporarily unblock Hood on Facebook in order to reinitiate contact with him. Evans provided J.H.'s mother with a message to send to Hood, which read as follows:

Sorry my parents r constantly gettin in my biz. I got my fone long enough to FB u. U can text me I guess on a textn app I got if you want. They don't know about it. [Redacted phone number] just make sure I know its u kk? I am goin to block u again so they won't know bye.

Hood responded to "J.H.'s" Facebook message almost immediately by texting the number "J.H." provided him. Right off the bat, Hood expressed a strong interest in becoming friends with "J.H." Hood quickly asked again if "J.H." had a boyfriend. Within hours, Hood asked "J.H." for a "clean" picture of "herself" and inquired if "she" would be able to video chat. Hood asked again when "J.H." turned 18. When "J.H." answered that "she" did not turn 18 until the following year, Hood replied, "[o]h geez lol" and two texts later said, "[y]ou are so beautiful."

As he did previously with the real J.H., Hood showered "J.H." with compliments and repeatedly told "her" that "she" was beautiful. Hood said to "J.H.," "I [] care about you," "I wanna make you feel good and happy," and "I want you to feel [comfortable] with me." "J.H" came back with responses such as, "[a]we, thank you soo much. Your sweet," and "[y]our kinda neat yourself." About twenty-four hours after first texting "J.H.," Hood began using terms of endearment such as "sweetie" and started reciting romantic poetry. "J.H." reciprocated to a certain extent, stating, for example, "I am liking you a lot your very sweet," and "I love the poetry and words you use." The text conversations went well into the night and resumed in the mornings, usually with Hood continuing the conversation.

Hood exhibited signs of fear that his relationship with "J.H." was inappropriate or violated the law. He inquired about "J.H.'s" parents, asking if they were "afraid u will do something or get together with a bad guy." Hood later asked if "J.H.'s" mom checked "J.H.'s" texts and if "her" mother was "mad at [him]." When "J.H." asked, "[w]hat do you think of when you think of me," Hood answered, "I have to be careful. You are 17. I know what I want to say. I think I've said a lot of what I think. I think you are a beautiful princess. I think of awesomeness, of a beautiful

painting, someone who I really want to get to know[.]  I wish I could tell you everything[.] . . . I want to tell you what I'm feeling just afraid."  The following morning, on July 13, 2017, Hood texted, "[u] swear u are not setting me up?" and added, "I'm just a little scared ok."  "J.H." feigned indignation at Hood's suspicion and threatened to stop communicating.  Hood sent a torrent of text messages in response, begging "J.H." to forgive him and professing his love for "her."  Despite the agent's telling Hood multiple times to "[l]eave me alone for a while," Hood did not relent.

On the third day of texting, Hood invited "J.H." to his apartment.  When asked what they would do at his apartment, Hood responded, "[j]ust talk lol . . . get to know each other."  It is at this point that "J.H." first suggested the possibility of a sexual relationship, responding that "I think if we care about each other intimacy is part of it."  Hood was hesitant at first to admit to wanting an "intimate" relationship, stating, "[c]an we just not see how things go.  I mean I want to get to know you."  "J.H." pretended to be affronted by Hood's refusal to express his sexual desires: "I see.  You want me to be honest and then when I ask you somethin direct you don't answer.  It gets tiring[.]"  Hood responded by saying, "I mean I want to see where things go.  If it happens it happens."  "J.H." continued to pester Hood to be upfront about his feelings.  The agent responded, "[t]hat's just it.  I want to know what your thinking and feeling when you say 'if it happens[.]' What is 'it[?]'"  Hood revealed that his reluctance to be forthright had to do with "J.H.'s" age, exclaiming, "[w]hy are u doing this to me?  You are 17.  I'm trying to be careful[.]"  Hood's evasiveness lasted for about one hour, after which he asked whether "J.H." was a virgin, whether "she" had had experience with sex, and if "she" looked "hot naked."  From there, the conversation became progressively more sexual in nature, with Hood graphically describing various sex acts and positions over the course of several hours.  Hood continued to send "J.H." sexually explicit text messages over the next few days.

As Hood and "J.H." got closer to arranging a meeting, Hood became increasingly afraid that he was the target of a sting operation. He repeatedly asked "J.H." for pictures of "herself" and phone calls to prove that "she" was real. Hood said, "I need to know you are not someone else doing this," and "[b]aby I could go to jail. I gotta make sure. . . . I need to know you ain't your mother or a cop." Several times in response, the agent gave Hood the opportunity to end the encounter. For instance, "J.H." said, "I don't see the point honestly [if] you don't believe it's me. I'm going to go for a while. I [have other] people I have been ignoring." In another text shortly thereafter, "J.H." told Hood that "[i]f I decide to continue our relationship so it can move forward [I] will let you know and probably call u or let you call me. My feelings are hurt and I'm exhausted from this[.] . . . I learned early that things don't always work out the way we want them too. This [relationship] may not work." Hood refused to give up on his relationship with "J.H.," however, telling "J.H." that "I want this [relationship] to work. . . . I can make u happy. U gotta trust me," and sent seven text messages during the next ninety minutes without receiving a response.

The next day, Agent Evans arranged a phone call with Hood using the real J.H. in the hope of allaying Hood's fears. After the call, Evans and Hood arranged to meet at a coffee shop in Knoxville. When Hood arrived at the coffee shop, he was arrested and taken into custody. After the arrest, police searched Hood's cell phone and found a "bookmark" that Hood had saved on his Google Chrome browser in 2016 entitled "Jr. Young Miss Nudist Pageant Pics." Hood had also searched Google for "teen nudist pageant" the day before he was arrested. The search of Hood's phone also turned up screen shots of two news articles that Hood had accessed in June 2017. The first related to a sheriff's deputy in Blount County, Tennessee who had been arrested on a child solicitation charge. Hood's son-in-law worked for the Blount County Sheriff's office at the time. The second article reported on a sheriff's deputy in Hamilton County, Tennessee, who was indicted

for having child pornography on his cell phone. Hood himself used to work at the Hamilton County Sheriff's office and had sent the article to a friend still employed there.

Hood was indicted in the Eastern District of Tennessee on one count of using "a facility or means of interstate and foreign commerce" to attempt to persuade, induce, and entice a minor to engage in sexual activity "for which any person can be charged with a criminal offense." *See* 18 U.S.C. § 2422(b). The underlying criminal offense was aggravated statutory rape under Tennessee law. *See* Tenn. Code Ann. § 39-13-506(c).

In advance of trial, Hood alerted the Government that he would be invoking an entrapment defense, and the Government tailored its proof accordingly. At the close of the Government's case, Hood moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied. Over the Government's objection, however, the district court agreed to put the entrapment question before the jury.

The jury rejected the entrapment defense and found Hood guilty. The district court imposed a sentence of 121 months' imprisonment, to be followed by a lifetime of supervised release. On appeal, Hood does not challenge the district court's entrapment jury instruction and instead appeals only the denial of his Rule 29 motion.

The district court properly denied Hood's motion for judgment of acquittal because the evidence of Hood's predisposition to commit the offense was sufficient to create a fact issue for the jury. *See United States v. Nelson*, 847 F.2d 285, 287-88 (6th Cir. 1988) (stating the standard). An entrapment defense requires proof of two interrelated elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity. *Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002). "The key question in determining predisposition is whether law enforcement

planted a 'criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so.'" *United States v. Demmler*, 655 F.3d 451, 457 (6th Cir. 2011) (quoting *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010)). In answering this question, courts examine the following factors:

> [1] the character or reputation of the defendant, including any prior criminal record; [2] whether the suggestion of the criminal activity was initially made by the Government; [3] whether the defendant was engaged in criminal activity for profit; [4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducements or persuasion; and [5] the nature of the inducement or persuasion supplied by the Government.

*Al-Cholan*, 610 F.3d at 950 (internal brackets omitted) (quoting *United States v. Moore*, 916 F.2d 1131, 1137 (6th Cir. 1990)). Although the first and second factors weigh in Hood's favor, and the third factor is neutral, the evidence otherwise strongly indicates predisposition.

With respect to the first factor, the Government argues that Hood's internet search history, in particular a saved bookmark of "Jr. Young Miss Nudist Pageant Pics," supports the inference that he was predisposed to targeting underage pageant contestants such as J.H. However, the Supreme Court's decision in *Jacobson v. United States*, 503 U.S. 540 (1992), compels a different conclusion. The defendant in *Jacobson* was charged with receipt of child pornography through the mails after a twenty-six-month-long campaign by government agents. *Id.* at 550. Before his contact with the government, the defendant had purchased a book containing child pornography, which at the time was legal. *Id.* at 551. Although this was an indication of Jacobson's "certain personal inclinations, including a predisposition to view photographs of preteen sex," it "hardly support[ed] an inference that he would commit the crime of receiving child pornography through the mails." *Id.* As the Court explained, "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing

predisposition." *Id.* at 550. Stated differently, "a person who resists his baser urges is not 'predisposed' simply because he experiences them." *United States v. Mayfield*, 771 F.3d 417, 436 (7th Cir. 2014) (en banc) (citing *Jacobson*, 503 U.S. at 551-52). Although Hood's internet search history may demonstrate an inclination to view lewd images of teenage girls—pageant contestants no less—it hardly demonstrates a predisposition to violate the law by having sexual relations with minors.[1] This is particularly true given that Hood had no criminal history and it is unclear from the record whether Hood ever violated any laws by having the bookmark on his phone.

The Government argues that *Jacobson* is not controlling because the bookmark on Hood's phone is more directly relevant to the crime at issue. But *Jacobson* makes clear that what matters is the *severity* of the pre-inducement conduct in relation to the crime attempted. *Jacobson*, 503 U.S. at 551. Jacobson's lawful purchase of child pornography did not suffice to demonstrate a predisposition to purchase *un*lawful child pornography. *Id.* Contrary to the Government's contention, *Jacobson* says nothing about the *relatedness* of the pre-inducement conduct to the crime. If anything, the crime in *Jacobson* (receipt of child pornography through the mails) was *more* closely related to the pre-inducement evidence (in-person purchase of child pornography) when compared to the present case. Consistent with this interpretation of *Jacobson*, the Seventh Circuit has rejected the idea that a defendant's possession of child pornography evidenced a predisposition to distribute it, observing that "[t]he government is not free to induce more-serious crimes simply because the target already committed a lesser crime." *United States v. McGill*, 754 F.3d 452, 458 (7th Cir. 2014). Accordingly, this first factor weighs in Hood's favor.

---

[1] Even less convincing is the Government's argument that the news articles about child pornography and solicitation of a minor found on Hood's phone are indicative of predisposition. As with the bookmark, Hood's viewing of these articles does little to suggest that he is prone to having sex with underage girls. Moreover, as Hood points out, these articles had a direct connection to people and places in Hood's life—making his viewing of them all the more benign.

The second factor—whether the Government first suggested the criminal activity—also favors Hood. It was Agent Evans who told Hood that "I would think if we care about each other intimacy is part of it." Although Hood at that point had already made clear his romantic feelings for "J.H.," this was the first time that either Hood or the agent had raised the topic of sex. The Government tries to argue that the term "intimacy" is ambiguous. Although it may be ambiguous in certain contexts, it was not in this one.

However, "the fact a government agent proposed an illicit transaction . . . is insufficient to establish entrapment." *United States v. Barger*, 931 F.2d 359, 367 (6th Cir. 1991); *accord Jacobson*, 503 U.S. at 549-50; *United States v. Harris*, 9 F.3d 493, 498 (6th Cir. 1993). Rather, the "most important factor" in determining predisposition is "whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements." *United States v. McLernon*, 746 F.2d 1098, 1113 (6th Cir. 1984) (quoting *United States v. Kaminksi*, 703 F.2d 1004, 1008 (7th Cir. 1983)). Here, the defendant exhibited little reluctance to engage in a sexual discussion with Agent Evans. It was less than one hour from when Evans first used the word "intimacy" that Hood began sending graphic sexual messages to "J.H." Moreover, the jury could reasonably infer that Hood's initial hesitance to mention sex flowed solely from the fear that he might be detected by law enforcement. Hood asked "J.H." if "she" was "setting [him] up" and told "J.H.," "I have to be careful. You are 17. . . . I want to tell u what I'm feeling just afraid." We have previously affirmed the denial of a motion for judgment of acquittal on the basis of entrapment when the defendant's "only reluctance appear[ed] to stem from a fear of getting caught." *United States v. Johnson*, 230 F.3d 1360, 2000 WL 1290317, at *5 (6th Cir. 2000) (unpublished table decision); *see also United States v. Unrein*, 688 F. App'x 602,

609-10 (11th Cir. 2017) (affirming denial of entrapment jury instruction); *United States v. Shinn*, 681 F.3d 924, 930 (8th Cir. 2012) (same).

The demonstrated reluctance to commit the crime in this case is on par with that in *United States v. Hackworth*, 483 F. App'x 972 (6th Cir. 2012). In *Hackworth*, the defendant told the undercover agent multiple times over the course of three days that he would not have sex with her due to her age. *Id.* at 974. During their conversations, the agent repeatedly taunted Hackworth, calling him "boring" for suggesting only that they meet and talk. *Id.* at 975-76. Further, the agent "pressed him to know 'what [was] on the table.'" *Id.* at 976 (alteration in original). We noted that these passages in the chat logs "viewed in isolation" supported the argument that Hackworth did not want to meet the underage girl for sex. *Id.* "Hackworth's explicit responses to [the agent's] prompting, however, cast sufficient doubt on his contention that he only wanted to meet this fourteen-year-old girl to talk." *Id.*

Hood asserts that he exhibited considerable reluctance in light of the Government's substantial inducement. Any inducement in this case, however, was minimal. "An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010) (quoting *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994)). The pressure exerted by Agent Evans was hardly excessive. Hood, after all, was the first to reach out to J.H. Once the government got involved, it took a mere three days for Hood to request sex with "J.H." and less than a week before he agreed to meet "her" for sex. In contrast, courts have found improper "inducement" where government agents or informants spent months or in some cases years attempting to facilitate the defendant's

commission of a crime.[2]  *See, e.g.*, *Jacobson*, 503 U.S. at 550 (over two years); *Sherman v. United States*, 356 U.S. 369, 371 (1958) (three months); *United States v. Barta*, 776 F.3d 931, 934-37 (7th Cir. 2015) (three months); *United States v. Poehlman*, 217 F.3d 692, 700 (9th Cir. 2000) (six months); *McLernon*, 746 F.2d at 1103, 1113 (eight years).  Nor did Agent Evans employ tactics typically found by courts to be excessive, including threats, *United States v. Becerra*, 992 F.2d 960, 963-64 (9th Cir. 1993), "dogged insistence," *United States v. Rodriguez*, 858 F.2d 809, 815 (1st Cir. 1988), appeals to sympathy, *Sherman*, 356 U.S. at 373, or "preying upon the love and loyalty of [a] special relationship."  *McLernon*, 746 F.2d at 1114.

The defendant relies upon *United States v. Poehlman*, 217 F.3d 692, 701 (9th Cir. 2000), to argue that "even very subtle governmental pressure, if skillfully applied, can amount to inducement."  He claims that "his reluctance was overcome only by 'J.H.'s' sustained campaign of emotional manipulation."  But the jury could have seen things differently.  As the Government points out, "[w]hen Hood started sending graphic sexual messages, his 'relationship' with J.H. was only a few days old and consisted entirely of Facebook and text messages.  They had never met or even talked on the phone."  Further, "[a]lthough Hood showered J.H. with compliments, a reasonable jury could find that they had not engaged in meaningful conversations or shared basic details about their lives."  Thus, this case is hardly like *Poehlman*, where an undercover agent engaged in a protracted six-month correspondence with the defendant that included sending emails, handwritten letters, and photographs, and strategically addressing the defendant by

---

[2] At oral argument, defendant's attorney pointed to *Sorrells v. United States*, 287 U.S. 435, 440 (1932), as an example of inducement where it took only ninety minutes for the undercover officers to convince the defendant to violate the law.  But the Court in *Sorrells* did not actually conclude that the defendant had been entrapped as a matter of law. Rather, the Court ruled "that upon the evidence produced . . . the defense of entrapment was available and that the trial court was in error in holding that as a matter of law there was no entrapment and in refusing to submit the issue to the jury." *Id.* at 452.  Moreover, the government agent in *Sorrells* succeeded by taking advantage of the defendant's sympathy for a fellow war veteran. *Id.* at 440.  As explained below, a reasonable jury could conclude that Hood was not similarly motivated by such a lawful purpose.

intimate names, in order to convince the defendant to have sex with the agent's fictitious minor children.  217 F.3d at 704.

The jury was also entitled to find that Agent Evans did not induce the defendant by "taking advantage of an alternative, non-criminal type of motive," in the words of *Dixon*, 396 F. App'x at 186 (citation omitted).  Hood argues that Agent Evans exploited Hood's desire for friendship and a romantic—yet non-sexual—relationship by "pushing Mr. Hood with ultimatums and demands." Similarly, he asserts that Agent Evans "cultivated Mr. Hood's hopes for a romantic relationship by admiring his poetry and pretending to be flattered by his interest."  But any reasonable juror could have come to the commonsense conclusion that Hood's intention all along was to have sex with J.H.  Hood's relationship with J.H escalated quickly; after contacting her out of nowhere, he immediately asked her if she had a boyfriend and attempted to charm her with compliments. Within hours, he had asked for J.H.'s phone number and began messaging her relentlessly when she failed to respond.  By the second day of communication with Agent Evans, Hood had told "J.H." that he loved "her" and began reciting romantic poetry.  Tellingly, when "J.H." asked Hood "what caught your eye about me if you don't mind me asking?"  Hood answered, "your beauty."

Agent Evans testified that in his experience, Hood's correspondence with J.H. raised red flags.  For instance, messages such as "I'm not trying to flirt" and "I'm just interested in talking to u" can be part of a strategy that older adults use to disarm underage children.  Courts in the entrapment context have recognized the concept of "grooming" a minor for sex, which involves talking about subjects that the underage person would be interested in for the purpose of building a trusting relationship.  *See United States v. Young*, 613 F.3d 735, 739 & n.3 (8th Cir. 2010); *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006).  In addition, Hood's demonstrated concern about being detected by law enforcement supports the reasonable inference that he was not seeking

a strictly platonic relationship with J.H.  *See United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010); *United States v. Hensley*, 574 F.3d 384, 391 (7th Cir. 2009); *cf. United States v. Wyatt*, 713 F. App'x 467, 471 (6th Cir. 2017).

The absence of any appeal to non-criminal motivations distinguishes this case from the ones cited by the defendant.  *United States v. Poehlman* dealt with a defendant who reached out to an undercover agent expressly seeking a long-term relationship with an adult who accepted his foot fetish and his interest in cross-dressing.  217 F.3d at 695.  The agent leveraged the defendant's desire for a legal adult relationship by conditioning any further communication on his agreement to have sex with the agent's fictitious daughters.  *Id.* at 698-700.  In *United States v. McLernon*, the defendant became convinced that his close friend, an undercover agent, would be killed if he did not negotiate a cocaine deal on his friend's behalf.  746 F.2d at 1113.  The government informant in *Sherman v. United States* exploited the defendant's sympathy to persuade the defendant to purchase narcotics.  356 U.S. at 373.  The informant, who (like the defendant) was a recovering drug addict, asked the defendant to supply him with drugs because he was not responding to treatment.  *Id.* at 371.  "Not until after a number of repetitions of the request, predicated on [the informant's] presumed suffering, did petitioner finally acquiesce."  *Id.*  The court in *United States v. Brooks*, 215 F.3d 842, 846 (8th Cir. 2000), determined that the defendant, a heroin addict, was entrapped as a matter of law because he began selling heroin only in response to a government informant's threat to cut off his drug supply.  Thus, although the government informant had appealed to the defendant's criminal motive (heroin possession), that motive was distinct from the crime committed (heroin distribution).

In sum, although the Government encouraged Hood to commit the offense in question, "[g]overnment agents do not entrap by merely presenting the opportunity to engage in criminal

activity." *United States v. Summers*, 238 F. App'x 74, 76 (6th Cir. 2007). Nor is the government prohibited from using "stealth and strategy" to catch unwary criminals. *Sherman*, 356 U.S. at 372. Hood seized the opportunity to engage in a romantic relationship with "J.H." and agreed to have sex within one hour of the agent's suggestion. Even accepting the premise that the Government induced Hood by capitalizing on his need for companionship, Hood's conduct, including his incessant flattery of "J.H." and outward display of fear that he would be detected by law enforcement, provided sufficient evidence from which a reasonable jury could conclude that he was predisposed to commit the instant offense. This is especially so given the defendant's burden to demonstrate a "'patently clear' absence of predisposition," *Nelson*, 847 F.2d at 287, as well as the "strong presumption in favor of sustaining a jury conviction," *United States v. Charles*, 138 F.3d 257, 265 (6th Cir. 1998) (quoting *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994)).

The judgment of the district court is affirmed.